# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-13-00358-CV

AEP Texas Commercial & Industrial Retail Limited Partnership, Appellant

v.

Public Utility Commission of Texas; Alliance for Retail Markets;
Texas Energy Association for Marketers; CPL Retail Energy, LP; WTU Retail Energy, LP;
and Direct Energy Business, LLC, Appellees

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. D-1-GN-12-003944, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## O P I N I O N

The principal issue presented in this appeal is whether the Public Utility Commission (PUC or Commission) reasonably construed chapter 39 of the Utilities Code and its own rules in determining that the proposed sharing of a common "name, trademark, brand, or logo" by an electric transmission and distribution utility and its competitive retail affiliate would amount to prohibited preferential "joint promotion" or "joint advertising" by those entities.[1] On this record, we conclude that it did. We also reject constitutional free-speech challenges to that prohibition, so construed.

---

[1] *Compare* Tex. Util. Code § 39.147(d)(6) *and* 16 Tex. Admin. Code § 25.272(h)(2) (Relationships with Affiliates) *with* Tex. Util. Code § 39.157(d)(5)(B) *and* 16 Tex. Admin. Code § 25.272(h)(1). All citations to Title 16 of the Texas Administrative Code are to rules promulgated by the PUC.

**BACKGROUND**

**Statutory and regulatory context**

This appeal arises against the backdrop of Texas's implementation of customer choice in its electric industry (a/k/a retail "deregulation"), so it is helpful to begin by recalling some of the history surrounding that sea change in market structure and regulatory policy. Before the advent of customer choice, electricity was produced, delivered, and sold to most Texas consumers by one of a handful of vertically integrated utilities that was each permitted to operate as the exclusive provider within a particular certificated area.[2] This market structure reflected the perception that the electricity generation and sale should be considered a natural monopoly in light of the enormous capital investment required to build the transmission and distribution system (i.e., the "wires" or "grid") necessary to transport the product,[3] not to mention the tremendous inefficiencies that would result if new market entrants duplicated those facilities.[4] It followed, in the views of policymakers,

---

[2] *See State v. Public Util. Comm'n*, 344 S.W.3d 349, 352–55 (Tex. 2011) (summarizing history of retail electric deregulation in Texas); *In re TXU Elec. Co.*, 67 S.W.3d 130, 132–33 (Tex. 2001) (same); *City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231, 235–36 (Tex. 2001) (same); *Cities of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 684–85 (Tex. App.—Austin 2005, pet. denied) (same); *see also Senate Interim Committee on Electric Utility Restructuring, Report to the 76th Legislature*, Tex. S.B. 7, 76th Leg., R.S. (1999) at 21 (hereinafter "*Senate Interim Report*") ("Most utilities in Texas have supplied power by acting as the sole agent for their customers, including generating, transmitting and distributing the power, and finally acting as customer service provider after the power is delivered.").

[3] Electric "transmission" refers to the transport of electricity over wires at high voltage, often over great distances, while "distribution" refers to the transport of electricity received from the transmission network, at lower voltage, to individual users. *See* 16 Tex. Admin. Code § 25.5(31)–(33) (Definitions) (distribution); *Public Util. Comm'n v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001) (transmission); *Public Util. Comm'n v. Cities of Harlingen*, 311 S.W.3d 610, 614 (Tex. App.—Austin 2010, no pet.) (transmission).

[4] *See State v. Texas Mun. Power Agency*, 565 S.W.2d 258, 273 (Tex. Civ. App.—Houston [1st Dist.] 1978, writ dism'd); *Senate Interim Report* at 27.

that electric utilities should be made subject to comprehensive regulation of prices and services as a substitute for market competition, and this regime was imposed first by individual municipalities and then on a statewide basis by the PUC pursuant to the 1975 Public Utility Regulatory Act (PURA).[5]

But by the 1990s, the Texas Legislature had become persuaded that the public interest would be better served by allowing competitive market forces to determine electricity prices and services to a much greater extent than previously allowed or thought feasible. In 1995, the Legislature amended PURA to create a competitive wholesale power market in which non-utility generators and marketers could sell electricity for purchase by regulated utilities.[6] A key component of this new regime was a requirement that the electric utilities provide the new market entrants non-discriminatory access to the utilities' transmission networks for a fee.[7] And, during its 1999 regular session, the Legislature went further with S.B. 7—codified chiefly in chapter 39 of the Utilities Code—which opened much of the Texas retail electric market to competition and left transmission and distribution as the sole industry component that could be operated as regulated monopolies

---

[5] *See* Public Utility Regulatory Act, 64th Leg., R.S., ch. 721, §§ 1–92, 1975 Tex. Gen. Laws 2527 (amended 1995, 1997, 1999); *City of Allen v. Public Util. Comm'n*, 161 S.W.3d 195, 207–08 (Tex. App.—Austin 2005, no pet.); *Senate Interim Report* at 27.

[6] *See* Public Utility Regulatory Act of 1995, 74th Leg., R.S., ch. 765, §§ 1.01–2.33, 1995 Tex. Gen. Laws 3972 (amended 1997, 1999); *Senate Interim Report* at 22–23.

[7] *See* Public Utility Regulatory Act of 1995, § 2.08, 1995 Tex. Gen. Laws at 4000; *Senate Interim Report* at 22–23; *Texas Mun. Power Agency v. Public Util. Comm'n*, 253 S.W.3d 184, 201–02 (Tex. 2007); *see also Senate Comm. on State Affairs, Bill Analysis*, Tex. S.B. 373, 74th Leg., R.S., at 18 (1995); *House Research Org., Electric Utility Restructuring in Texas: A Status Report* 2 (2001) (available at http://www.hro.house.state.tx.us/pdf/focus/electric.pdf) (hereinafter "*HRO Report*").

in those areas.[8]  Under the new regime, simply described, competing electric retailers are able to

purchase power in the wholesale market and resell it to consumers, with prices and service offerings

determined by market dynamics, as with other consumer products, and are entitled to use the

monopoly utilities' transmission and distribution networks to deliver the product in exchange for the

retailer's payment of a still-regulated rate.[9]  Retail consumers, in turn, are no longer relegated to

purchasing their electricity from whichever monopoly happens to serve their geographic area, but are

empowered to choose among alternative providers.[10]  Affording consumers this freedom to choose

and the resultant competition for their business, the theory goes, tends to reduce prices, improve the

quality and range of services offered, and otherwise advance consumer welfare and the public

interest to a greater extent than achieved under the former comprehensive regulatory regime.[11]

        The Legislature prescribed that customer choice under this new regime would begin

on January 1, 2002, and would apply in the certificated service areas of all utilities operating

---

[8]  *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 1–67, 1999 Tex. Gen. Laws 2543, 2543–2625 ("[T]his chapter is enacted to protect the public interest during the transition to and in the establishment of a fully competitive electric power industry.").

[9]  *See Cities of Corpus Christi*, 188 S.W.3d at 684–85; *HRO Report* at 1–2.

[10]  *See Cities of Corpus Christi*, 188 S.W.3d at 684; *HRO Report* at 1.

[11]  *See City of Corpus Christi*, 51 S.W.3d at 237; *see also* Tex. Util. Code § 39.001(a) ("The legislature finds that the production and sale of electricity is not a monopoly warranting regulation of rates, operations, and services and that the public interest in competitive electric markets requires that, except for transmission and distribution services and for the recovery of stranded costs, electric services and their prices should be determined by customer choices and the normal forces of competition."), (b) ("The legislature finds that it is in the public interest to: (1) implement on January 1, 2002, a competitive retail electric market that allows each retail customer to choose the customer's provider of electricity and that encourages full and fair competition among all providers of electricity; . . . .").

within the Electric Reliability Council of Texas (ERCOT)[12] that are owned by private investors.[13] To that end, the Legislature mandated a fundamental restructuring of the electric industry in those areas. By January 1, 2002, each incumbent electric utility subject to customer choice was required to separate (a/k/a "unbundle") their formerly integrated business activities into the following distinct units: (1) a power generation company, which would own and operate the formerly integrated utility's generation assets; (2) a "retail electric provider" (REP), which would succeed to the retail component of the utility's business, including its customers, and compete to retain them once customer choice began; and (3) one or more electric transmission and distribution utilities (TDUs), which would own the former utility's wires and deliver power over them for others as a rate-regulated monopoly, but were restricted from owning generation assets or buying or selling electricity themselves.[14] Importantly for this case, however, the Legislature did not require a complete legal separation between these units, but permitted a utility to unbundle by creating separate affiliated companies that are owned by a common holding company.[15]

In addition to requiring this restructuring of the electric market in the regions being opened to competition, the Legislature imposed further measures calculated to curtail the market dominance that otherwise might be carried over by the unbundled units of the formerly integrated utilities so as to allow competition to take root. To encourage new entrants into the nascent retail

---

[12] *See* Tex. Util. Code § 31.002(5) (defining ERCOT).

[13] *See id.* §§ 39.002, 39.102(a). Additionally, municipally-owned utilities and electric cooperatives were allowed to participate in customer choice voluntarily. *See id.* § 39.002.

[14] *See id.* §§ 31.002(1), 39.051, 39.102(b), 39.105, 39.157(b); *HRO Report* at 4.

[15] *See* Tex. Util. Code § 39.051(c); *see also id.* § 11.003(2) (defining "affiliate"); *HRO Report* at 4.

5

market, the Legislature required an REP affiliated with a TDU to charge an above-market "price to beat" to its residential and small commercial customers within the TDU's service area until the earlier of 36 months after customer choice began (January 1, 2005) or the REP lost at least 40 percent of its market share in the customer class to competing REPs.[16] It likewise imposed limits on the percentage of generation capacity that any one power-generation company could own in a given region after the start of retail competition.[17] Additionally, the Legislature authorized the Commission, during both the transition to competition and thereafter, to "monitor market power associated with the generation, transmission, distribution, and sale of electricity in this state" and take actions to curtail "market power abuses."[18] Such "abuses," the Legislature elaborated, consist of "practices by persons possessing market power that are unreasonably discriminatory or tend to unreasonably restrict, impair, or reduce the level of competition, including practices that tie unregulated products or services to regulated products or services[,] unreasonably discriminate in the provision of regulated services[,] . . . predatory pricing, withholding of production, precluding entry, and collusion."[19] On the other hand, the Legislature emphasized, "[t]he possession of a high market share in a market open to competition may not, of itself, be deemed to be an abuse of market power."[20]

---

[16]  *See* Tex. Util. Code § 39.202; *Office of Pub. Util. Counsel v. Public Util. Comm'n*, 104 S.W.3d 225, 229 (Tex. App.—Austin 2003, no pet.).

[17]  *See* Tex. Util. Code §§ 39.154–.156, .157(c).

[18]  *Id.* § 39.157(a).

[19]  *Id.*

[20]  *Id.*

6

A related concern of the Legislature was the potential for "market power abuses" that were potentially invited by its decision to allow the formerly integrated utilities to unbundle into affiliated business units,[21] a relationship that tended to provide incentives for leveraging the assets and monopoly position of the TDUs to aid the affiliates operating in competitive markets. In addition to requiring the above-described functional separation between a TDU and any affiliated REP or power generation company,[22] the Legislature directed the Commission, in subsection (d) of PURA Section 39.157, to "adopt rules and enforcement procedures to govern transactions or activities between a [TDU] and its competitive affiliates to avoid potential market power abuses and cross-subsidizations between regulated and competitive activities both during the transition to and after the introduction of competition."[23] These rules and procedures—termed the "Code of Conduct"—were to include seventeen categories of safeguards and prohibitions that were enumerated within subsection (d) of Section 39.157.[24] To summarize, the seventeen enumerated categories require structural separation and arm's-length dealing between TDUs and their competitive affiliates; prohibit discrimination or favoritism in the TDU's provision of its products and services to aid competitive affiliates, harm the affiliates' rivals, or both; and greatly curtail the ability of TDUs to share facilities, personnel, information, or other assets with, or to make expenditures to benefit, their competitive affiliates.[25] A Code of Conduct violation that "materially

---

[21] *See id.* § 39.051(c).

[22] *See id*. §§ 39.105, .157(b).

[23] *Id*. § 39.157(d).

[24] *See id*.

[25] *See id*. § 39.157(a), (d).

7

impairs the ability of a person to compete in a competitive market," the Legislature further provided, would be "deemed to be an abuse of market power."[26] To comply with these statutory directives, the Commission promulgated Rule 25.272, titled "Code of Conduct for Electric Utilities and Their Affiliates."[27]

Although imposing these limitations on TDUs and their affiliates within chapter 39, the Legislature has emphasized that its overarching goal is not to control outcomes in the deregulated retail electric market, but to foster and protect competition in that market, and thereby advance the public interest it perceives in "establish[ing] . . . a fully competitive electric power industry."[28] Consistent with that goal, the Legislature has specifically forbidden regulatory authorities in areas open to customer choice from "mak[ing] rules or issu[ing] orders regulating competitive electric services, prices, or competitors or restricting or conditioning competition except as authorized in [PURA] [or] discriminat[ing] against any participant or type of participant during the transition to a competitive market and in the competitive market."[29] Similarly, regulatory authorities in areas open to customer choice "shall authorize or order competitive rather than regulatory methods to achieve the goals of [Chapter 39] to the greatest extent feasible and shall adopt rules and issue orders that are both practical and limited so as to impose the least impact on competition."[30]

---

[26] *Id*. § 39.157(a).

[27] *See* 16 Tex. Admin. Code § 25.272.

[28] Tex. Util. Code § 39.001(a).

[29] *Id.* § 39.001(c).

[30] *Id.* § 39.001(d).

**The present dispute**

The immediate focus of the present dispute is a rule adopted by the Commission to regulate the entry of REPs into the competitive retail electric market. Notwithstanding its "deregulation" of this market, the Legislature imposed some barriers to entry by requiring an entity desiring to do business as an REP to first obtain certification from the Commission.[31] The Legislature likewise specified prerequisites for certification that included demonstrating sufficient financial, technical, and managerial wherewithal to provide reliable electric service to consumers,[32] as well as compliance with "all applicable customer protection provisions, disclosure requirements, and marketing guidelines established by the [Commission] and [PURA]."[33] The latter requirements served to incorporate the Code of Conduct and its restrictions on dealings between REPs and affiliated TDUs into the threshold requirements with which prospective REPs had to comply in order even to enter the market.

In a rule implementing the statutory REP certification requirement—PUC Rule 25.107[34]—the Commission has prescribed, in subsection (e)(1), that REPs may provide services only under a business name or names that the Commission must approve as part of the certification process.[35] To gain approval under Rule 25.107(e)(1), a business name "shall not be deceptive,

---

[31]  *See id.* § 39.352.

[32]  *See id.* § 39.352(b).

[33]  *Id.* § 39.353(c).

[34]  *See* 16 Tex. Admin. Code § 25.107 (Certification, Licensing and Registration).

[35]  *See id*. § 25.107(e)(1).

9

misleading, vague," or "otherwise contrary" to the Code of Conduct.[36] "If the [C]ommission determines that any requested name does not meet [these] requirements . . . it shall notify the applicant that the requested name shall not be used by the REP," and "[a]n application shall be dismissed if an applicant does not provide at least one suitable name."[37]

Since 2001, the appellant here, AEP Texas Commercial & Industrial Retail Limited Partnership (AEP REP), has been certified by the Commission to provide—under names that include, of relevance here, the assumed name of "AEP Retail Electric"—retail electric service to customers having loads of one megawatt or greater, i.e., industrial and large commercial customers only.[38] This limitation on the identity of customers AEP REP can serve, the parties agree, is characteristic of what the Commission's REP certification rule terms its "Option 2" certification classification, which stands in contrast to the Commission's "Option 1" certification classification that would instead permit an REP to provide retail electric service to customers within a particular geographic region.[39] But, in 2011, AEP REP filed an application with the Commission requesting that its Option 2 certification be amended to instead become an Option 1 certification that would permit it to serve, without limitation, electric consumers anywhere in Texas where retail competition

---

[36] *Id.* § 25.107(e)(1)(B).

[37] *Id.* § 25.107(e)(1)(C).

[38] Which corresponds to the entity's legal name "AEP Texas *Commercial & Industrial Retail* Limited Partnership."

[39] *See* Tex. Util Code § 39.352(a), (d); 16 Tex. Admin. Code § 25.107(d)(1)–(2).

10

exists. The primary significance of this change would be that AEP REP would be authorized to sell retail electric services to Texas residential and small commercial customers for the first time.[40]

As part of its application, AEP REP also sought approval to use, as an Option 1 REP, the same "AEP Retail Electric" assumed name that the Commission had previously authorized for use under the company's more limited Option 2 certification.[41] As its name suggests, AEP REP is a subsidiary of American Electric Power Company, Inc. (AEP), an investor-owned holding company that has subsidiaries operating in the electric industry in Texas and several other states. In its application, AEP REP explained that use of the assumed name "AEP Retail Electric" was "an important part" of a "multi-market, multi-state marketing" strategy of the AEP corporate family that was aimed at "promot[ing] brand name recognition" in the retail electric markets of Texas and other states that AEP subsidiaries or affiliates had entered or planned to enter. Similarly, AEP REP acknowledged that members of the AEP corporate family commonly utilize uniform branding that emphasizes the "AEP" abbreviation and a distinctive logo consisting of a red parallelogram with a white "AEP" inside, and that it intended to use the same sort of branding, alongside the "AEP Retail Electric" name, if its application was approved. Consequently, although

---

[40] Appellees also urge that there was no evidence AEP REP had ever sold retail electric service even to the large customers authorized by its Option 2 certification, and further claim that AEP REP is not currently active in Texas.

[41] AEP REP's Option 2 certification had also permitted it to use the assumed name "AEP Plus," as well as its actual "certificated name," its legal name of AEP Texas Commercial & Industrial Retail Limited Partnership. While AEP REP initially sought approval to carry over all three names in the Option 1 certification it sought, only its request to use "AEP Retail Electric" remains at issue on appeal.

11

Rule 25.107(e)(1) empowers the Commission to approve or disapprove "business names" and does not refer explicitly to logos or symbols,[42] the parties have seemed to agree that, for all practical purposes, AEP REP's application effectively sought approval not only of the "AEP Retail Electric" moniker itself, but also the company's anticipated accompanying use of the "AEP" abbreviation and red parallelogram logo.

AEP REP's application was opposed by the Commission's staff and, either individually or through associations, by approximately twenty REPs that already held Option 1 certifications and served residential and small commercial customers in regions of Texas that have been opened to retail competition (the Intervenors).[43] Collectively, the opponents' chief objection was that AEP REP's proposed use of the "AEP Retail Electric" assumed name and accompanying AEP branding when operating in the competitive Texas retail "mass market" would be "deceptive," "misleading," "vague," or "otherwise contrary" to the Code of Conduct, and thus in violation of Rule 25.107(e)(1), in the context of ongoing activities by two other AEP subsidiaries in areas of the Texas electric market that had been opened to retail competition.

In 1997, AEP (the holding company) had acquired, through merger, Texas subsidiaries that included Central Power & Light (also known as CP&L), an integrated electric utility whose certificated service area encompassed portions of South Texas, and West Texas Utilities (WTU), which, as the name suggests, was an integrated electric utility whose service area

---

[42] *See* 16 Tex. Admin. Code § 25.107(e)(1).

[43] The named Intervenors are REPs CPL Retail Energy, LP; WTU Retail Energy, LP; and Direct Energy Business, LLC; and two associations, the Alliance for Retail Markets (ARM) and the Texas Energy Association for Marketers (TEAM). ARM and TEAM are incorporated associations whose members are REPs certificated by the PUC to provide retail electric service in regions of Texas within ERCOT.

encompassed territory in West Texas. Both utilities' certificated service areas were among those that the Legislature subsequently opened to customer choice in S.B. 7. In accordance with chapter 39 of the Utilities Code, in advance of the January 1, 2002 start date of customer choice, the Central Power & Light subsidiary was restructured into a TDU that carried on the same name and an affiliated REP known as "Mutual Energy CPL," an Option 1 REP certified to serve retail customers (including residential and small commercial customers) within the CP&L service area. Similarly, the required restructuring of the West Texas Utilities subsidiary yielded a "West Texas Utilities" TDU and an affiliated REP known as "Mutual Energy WTU," an Option 1 REP that served customers within the WTU service area.

In late 2002, AEP sold the two affiliated REPs to a third party, and these entities or their successors have since continued to operate as Option 1 REPs in their respective native service areas, unaffiliated with AEP, under business names that incorporate some version of the "CP&L" and "WTU" monikers. The current iterations of these REPs are known as CPL Retail Energy, LP; and WTU Retail Energy, LP. Both entities intervened in opposition to AEP REP's application.

Meanwhile, the TDUs serving the former CP&L and WTU service areas have remained under AEP ownership. Around the time AEP sold the two affiliated REPs in late 2002, it renamed the "Central Power & Light" TDU to "AEP Texas Central Company" (AEP TCC) and the "West Texas Utilities" TDU to "AEP Texas North Company" (AEP TNC). Thereafter, it is undisputed that AEP TCC and AEP TNC have done business under the shared or "umbrella" moniker of "AEP Texas," accompanied by the distinctive "AEP" branding with red parallelogram logo.

13

Against this historical backdrop, to summarize the objections of the Commission staff and the Intervenors, they insisted that allowing AEP REP to sell electricity in the Texas "mass market" as "AEP Retail Electric," with the same "AEP" identifier and logo as the "AEP Texas" TDUs, would—especially within the "AEP Texas" TDUs' two service areas—be "deceptive," "misleading," and "vague," and thus in violation of Rule 25.107(e)(1), in the sense that retail and small commercial customers would perceive incorrectly that "AEP Retail Electric" and "AEP Texas" were one and the same or that customers of "AEP Retail Electric" otherwise stood to benefit from that company's affiliation with the TDU.[44]  Similarly, they urged that if AEP REP were permitted to exploit this asserted "customer confusion" by operating under the "AEP Retail Electric" name and shared AEP branding, it would amount to the sort of cross-subsidization from "AEP Texas" assets to benefit its affiliated REP that violates the Code of Conduct.  Among other Code of Conduct prohibitions that would be implicated, the opponents insisted, was a ban on preferential "joint advertising or promotional activities" found in PURA Section 39.157(d)(6) and PUC Rule 25.272(h)(2).  PURA Section 39.157(d)(6) requires that the Code of Conduct ensure "a [TDU] does not conduct joint advertising or promotional activities with a competitive affiliate in a manner that favors the competitive affiliate."[45]  Rule 25.272(h)(2), in turn, provides in pertinent part that a "utility shall not engage in joint marketing, advertising, or promotional activities of its products or

---

[44] For example, perceiving that the affiliation would enable them to obtain more reliable service from AEP REP or more responsive restoration of service following outages.

[45] Tex. Util. Code § 39.157(d)(6).

services with those of a competitive affiliate in a manner that favors the affiliate," and provides several illustrative examples of such conduct.[46]

AEP REP countered chiefly that any concerns about its intended sharing of names or branding with the "AEP Texas" TDUs were resolved in its favor by a different provision within the Code of Conduct. AEP REP emphasized PURA Section 39.157(d)(5)(B), which requires that the Code of Conduct adopted under that section shall ensure that a utility does not—

> allow a competitive affiliate, before September 1, 2005, to use the utility's corporate name, trademark, brand, or logo unless the competitive affiliate includes on employee business cards and in its advertisements of specific services to existing or potential residential or small commercial customers locating within the utility's certificated service area a disclaimer that states, "(Name of competitive affiliate) is not the same company as (name of utility) and is not regulated by the Public Utility Commission of Texas, and you do not have to buy (name of competitive affiliate)'s products to continue to receive quality regulated services from (name of utility)."[47]

AEP REP similarly invoked the provision of the Code of Conduct rules through which the Commission implemented this requirement, PUC Rule 25.272(h)(1), which is materially identical to the underlying statutory directive.[48] In the view of AEP REP, PURA Section 39.157(d)(5)(B) and

---

[46] 16 Tex. Admin. Code § 25.272(h)(2).

[47] Tex. Util. Code § 39.157(d)(5)(B).

[48] Rule 25.272(h)(1) provides:

Before September 1, 2005, a utility shall not allow the use of its corporate name, trademark, brand, or logo by a competitive affiliate, on employee business cards or in any written or auditory advertisements of specific services to existing or potential residential or small commercial customers located within the utility's certificated service area, whether through radio or television, Internet-based, or other electronic format accessible to the public, unless the competitive affiliate includes a disclaimer with its use of the utility's corporate name, trademark, brand, or logo. Such disclaimer of the corporate name, trademark, brand, or logo in the material

15

Rule 25.272(h)(1) amounted to an acknowledgment that it was allowed, as a "competitive affiliate" of the "AEP Texas" TDUs,[49] to share with them a common "corporate name, trademark, brand, or logo," and that the sole limitation on its right to do so was a disclaimer requirement that had expired in 2005.[50]

The Commission referred the proceeding to the State Office of Administrative Hearings (SOAH) and requested briefing on "threshold legal and policy issues" concerning the extent to which PURA Section 39.157(d)(5)(B) and Rule 25.272(h)(1), the disclaimer provisions on which AEP REP had relied, affected the application of Rule 25.107(e)(1)(B)'s requirements, emphasized by AEP REP's opponents, that an REP's business name not be "deceptive," "misleading," "vague," or "otherwise contrary" to the Code of Conduct if the REP is to be certified to provide retail electric services under that name. The Commission subsequently issued a preliminary order concluding that:

> distributed must be written in a bold and conspicuous manner or clearly audible, as appropriate for the communication medium, and shall state the following: "[Name of competitive affiliate] is not the same company as [name of utility] and is not regulated by the Public Utility Commission of Texas, and you do not have to buy [name of competitive affiliate]'s products to continue to receive quality regulated services from [name of utility]."

16 Tex. Admin. Code § 25.272(h)(1).

[49] Thus, AEP REP has acknowledged that while it is not one of the original retail units that were successors to the former integrated utilities known as Central Power & Light and West Texas Utilities, it is nonetheless "affiliated" with, and is an "affiliated REP" and "competitive affiliate" of, the "AEP Texas" TDUs. *See* Tex. Util. Code §§ 11.003(2) (defining "affiliate"), 31.002(2) (defining "affiliated retail electric provider"), 39.157(i)(1) (defining "competitive affiliate). Consequently, it concedes that its dealings with the "AEP Texas" TDUs are subject to the Code of Conduct.

[50] AEP REP also argued that the business name "AEP Retail Electric" was not "deceptive," "misleading," or "vague," but instead was a clear and accurate description of the nature of its intended business (retail electric services) and the existence of its lawful affiliation with AEP.

16

- "PURA § 39.157(d)(5) [in context, a reference to PURA Section 39.157(d)(5)(B), the statutory disclaimer requirement] does not apply to this docket because this statute only allows a competitive affiliate to use the same corporate name, trademark, brand, or logo as that of its affiliate TDU prior to September 1, 2005."

- "[N]either PURA § 39.157(d)(5)[(B)] nor P.U.C. Subst. R. 25.272 [in context, presumably a reference to Rule 25.272(h)(1), the rule provision implementing PURA Section 39.157(d)(5)(B)] preclude the Commission from determining pursuant to P.U.C. Subst. R. 25.107(e)(1)(B) whether a retail electric provider's name is deceptive, misleading, vague, or otherwise contrary to [the Code of Conduct]."

- PURA does not address the shared use of business names after 2005.

Instead, the Commission further reasoned, its application of Rule 25.107(e)(1)'s requirements to AEP REP's application turned principally on "fact issues," and it identified several for SOAH to address. Among these were:

- "Would AEP REP's use of . . . the d/b/a[] AEP Retail Energy . . . be deceptive, misleading, vague, or otherwise contrary to [the Code of Conduct] if AEP REP provides electric service to residential customers and small and medium non-residential customers for the entire state?"

- "Will AEP [REP]'s proposed use of . . . the d/b/a[] AEP Retail Energy . . . constitute a violation [of] the PURA § 39.157(d)(6) requirement that a utility not conduct joint advertising or promotion activities with a competitive affiliate in a manner that favors the competitive affiliate[?]"

- "Has the applicant shown that it meets all other requirements of PUC Subst. R. 25.107 other than PUC Subst. R. 25.107(e)?"

- "Should AEP REP's application to amend its REP Certificate . . . be approved?"

Thereafter, a contested-case hearing was held before a SOAH Administrative Law Judge (ALJ). The evidence centered on two basic sets of factual issues. First, the opponents emphasized evidence to the effect that retail consumers in the service areas of the "AEP Texas"

17

TDUs already had extensive familiarity with the AEP name and branding from a decade of use on the "AEP Texas" TDUs' assets (e.g., vehicles, employee uniforms, electric meters on consumers' properties, and an online presence that included a website and Facebook page), not to mention advertisements and publicly recognized community and charitable contributions. In fact, the evidence included an AEP REP-conducted survey of residential customers in the "AEP Texas" service areas indicating that 73 percent of respondents were already familiar with both the name "AEP Texas" and the name "AEP Retail Energy," even though the latter had yet to operate as a mass-market REP. This extent of familiarity ranked "AEP Texas" and "AEP Retail Energy" in a tie for third among a list of fourteen existing REP and TDU companies about which the survey inquired, finishing behind only Reliant and TXU Energy—Texas's two largest REPs—and about twenty points higher than the next highest in familiarity, WTU Retail Energy and CPL Retail Energy, the service areas' original incumbent REPs.

Second, the opponents emphasized evidence that retail customers in the "AEP Texas" service areas tended to overlook the different roles of TDUs and REPs in the electric market, both generally and with regard to the "AEP Texas"/"AEP Retail Energy" distinction in particular. For example, the AEP REP customer survey indicated that over one-third of respondents perceived incorrectly that the company from which they bought electricity (i.e., the REP) also owned, maintained, and repaired the wires that delivered the electricity. Similarly, 32 percent of respondents mistakenly believed that "AEP Retail Energy" provided electric transmission and distribution services. The parties differed as to the inferences that could be drawn from this information. The opponents asserted that the use of a shared name would exacerbate customer confusion in the AEP Texas service areas with regard to which entity performs what functions and

18

with regard to an expectation of benefits that neither AEP REP nor the AEP Texas TDUs are allowed to provide under PUC rules. Conversely, AEP REP maintained that a shared name would not benefit AEP REP or impair a customer's ability to make an informed choice, citing data suggesting that the same confusion or false expectations would be associated with any other name it might have selected.

Following the hearing, the ALJ issued a proposal for decision that AEP REP had met all requirements for Option 1 certification, including demonstrating, as Rule 25.107(e)(1)(B) required, that the proposed "AEP Retail Energy" assumed name was not "deceptive," "misleading," "vague," or otherwise in violation of the Code of Conduct. Accordingly, the ALJ recommended that the Commission grant the application. However, the Commission, over a dissent from its Chair, issued a final order denying AEP REP's application. The order incorporated, as Conclusions of Law 2A, 2B, and 2C, the Commission's prior threshold determinations that PURA Section 39.157(d)(5)(B) and Rule 25.272(h)(1) did not apply to or otherwise impact its determination under Rule 26.107(e)(1)(B) of whether AEP REP's proposed use of a shared name, logo, or branding with the "AEP Texas" TDUs would be "deceptive," "misleading," "vague," or "otherwise contrary" to the Code of Conduct. As for that inquiry, the Commission held that the proposed use would be "otherwise contrary" to the Code of Conduct. Specifically, it determined, in its Conclusion of Law 10:

> The sharing of the AEP acronym and AEP's red parallelogram logo[51] by both
> AEP Retail Energy and its affiliated TDUs as described in this case violates the

---

[51] An illustration of which was attached as an exhibit to the final order.

19

prohibition in PURA § 39.157(d)(6) [and] P.U.C. Subst. R. 25.272(h)(2) of joint advertising and promotional activities that favors a competitive affiliate.

This was the Commission's sole ground for denying AEP REP's application—it did not make findings or conclusions regarding any other component of the Code of Conduct or of Rule 25.107.

In support of its ultimate determination in Conclusion of Law 10 that AEP REP's "sharing of the AEP acronym and AEP's red parallelogram logo as described in this case" violates the ban on preferential "joint advertising and promotional activities," the Commission found the following underlying facts:

18. Even though AEP Retail Energy has never marketed to residential customers in Texas, the consumer survey conducted by AEP [REP] in this proceeding shows that AEP Retail Energy ranked third highest in familiarity among 14 of the other existing retail and wires companies listed in the survey and 73% of respondents in the AEP territories claimed some level of familiarity with the business name AEP Retail Energy, identical to the percentage of survey respondents that had any familiarity with the name AEP Texas.

19. The consumer survey conducted by AEP [REP] in this proceeding shows that 32% of those who live in the AEP Texas TDU service area believed that the entity named AEP Retail Energy provides transmission and distribution services.

20. The consumer survey conducted by AEP [REP] in this proceeding shows that over one third of Texas consumers believe that the company that they buy electricity from also owns, maintains, and repairs the wires that deliver the electricity to their home.

21. AEP's red parallelogram corporate logo is omnipresent in communities served by AEP Texas TDUs.

22. AEP Retail Energy and AEP's Texas TDUs will share not only the AEP acronym, but also AEP's distinctive red parallelogram logo when advertising and promoting either AEP Retail Energy or AEP's Texas TDUs.

20

23. AEP's red parallelogram corporate logo is used on all websites for all AEP companies.

24. Neither AEP [REP]'s application to amend its REP certificate nor its consumer survey conducted in this proceeding addressed AEP [REP]'s marketing strategy to use AEP's red parallelogram corporate logo in conjunction with the business name AEP Retail Energy.

25. The same website entry page as that used for AEP Ohio Retail Energy would be used for AEP Retail Energy if AEP [REP] were allowed to use AEP Retail Energy as its business name.

The Commission further reasoned, in what were styled as Findings of Fact 26 and 27:

26. While a regulated utility and a competitive affiliate are not categorically prohibited by PURA and Commission rules from sharing the same or similar names, the marketing efforts of competitive affiliates with shared branding have a greater potential for causing confusion among customers.

27. AEP Retail Energy and the AEP Texas TDUs['] sharing of identical AEP branding is joint promotion that will cause confusion among customers and result in favoring AEP Retail Energy over non-affiliated REPs.

After unsuccessfully seeking rehearing before the agency, AEP REP sued for judicial review of the Commission's final order in the district court.[52] The individual REPs and associations that had opposed AEP REP's application in the agency proceedings again intervened in support of the Commission's order. The district court rendered judgment affirming the Commission's order in full.

This appeal ensued.

---

[52] *See* Tex. Util. Code § 15.001 (granting right to judicial review); *see also* Tex. Gov't Code § 2001.171 (granting right to judicial review of agency final decision in contested case).

## ANALYSIS

AEP REP challenges the validity of the Commission's final order in three issues. In its first two issues, AEP REP argues that the Commission's decision—and, in particular, its decisive determination in Finding of Fact 27 that "AEP Retail Energy and the AEP Texas TDUs['] sharing of identical AEP branding" would be preferential joint promotion that violates PURA Section 39.157(d)(6) and Rule 25.272(h)(2)—rests upon a construction of PURA and Commission rule provisions that is unreasonable and contrary to the unambiguous texts of those provisions. In its third issue, AEP REP adds that Section 39.157(d)(6) and Rule 25.272(h)(2), so construed and applied, violate its free-speech rights under the constitutions of Texas and of the United States.

### Standard of review

We review the Commission's final order under the "substantial evidence" standard that is codified in the Administrative Procedure Act (APA).[53] This standard requires that we reverse or remand a case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are:

(A)   in violation of a constitutional or statutory provision;
(B)   in excess of the agency's statutory authority;
(C)   made through unlawful procedure;
(D)   affected by other error of law;
(E)   not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
(F)   arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[54]

---

[53] *See* Tex. Gov't Code § 2001.174; Tex. Util. Code § 15.001 ("Any party to a proceeding before the commission is entitled to judicial review under the substantial evidence rule.").

[54] Tex. Gov't Code § 2001.174(2).

Essentially, this is a rational-basis test to determine, as a matter of law, whether an agency's order finds reasonable support in the record.[55] "The test is not whether the agency made the correct conclusion in our view, but whether some reasonable basis exists in the record for the agency's action."[56] We apply this analysis without deference to the district court's judgment.[57] We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden is on the contestant to demonstrate otherwise.[58]

Substantial-evidence analysis entails two component inquiries: (1) whether the agency made findings of underlying facts that logically support the ultimate facts and legal conclusions establishing the legal authority for the agency's decision or action and, in turn, (2) whether the findings of underlying fact are reasonably supported by evidence.[59] The second inquiry, which has been termed the "crux" of substantial-evidence review,[60] is highly deferential to the agency's determination: "substantial evidence" in this sense "does not mean a large or considerable amount of evidence"—in fact, the evidence may even preponderate against the agency's finding—but requires only "such relevant evidence as a reasonable mind might accept as adequate

---

[55] *See Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452–53 (Tex. 1984).

[56] *Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 549 (Tex. App.—Austin 2011, pet. denied).

[57] *See Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam).

[58] *See Slay*, 351 S.W.3d at 549.

[59] *See Vista Med. Ctr. Hosp. v. Texas Mut. Ins. Co.*, 416 S.W.3d 11, 26–27 (Tex. App.—Austin 2013, no pet.) (citing *Charter Med.-Dallas*, 665 S.W.2d at 453).

[60] *See Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.) (citing John E. Powers, *Agency Adjudications* 163 (1990)).

23

to support a [finding] of fact."[61]  Likewise, we "may not substitute [our] judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion."[62] In contrast, the first inquiry, concerning the extent to which the underlying facts found by the agency logically support its ultimate decision or action, may entail embedded questions of law that we review de novo.[63]

Like advocates for affirming administrative orders often do, appellees (the Commission and the Intervenors) emphasize the factual or evidentiary component of substantial-evidence analysis and argue that the Commission's findings of underlying fact concerning, for example, the notoriety of AEP branding among consumers and the prevalence of "customer confusion" are easily supported by "substantial evidence" of those facts.  But the principal focus of AEP REP's appellate issues is not whether there is "substantial evidence" to support the Commission's findings of underlying fact—in fact, AEP REP does not even challenge most of these findings—but the other component of "substantial-evidence" analysis, whether the findings of underlying fact logically support the Commission's ultimate decision to deny AEP REP's application on the ground that AEP REP's anticipated "sharing of identical AEP branding" with the "AEP Texas" TDUs constitutes "joint promotion . . . favoring AEP Retail over non-affiliated REPs" under PURA Section 39.157(d)(6) and Rule 25.272(h)(2).  The answer to that question turns initially

---

[61]  *Slay*, 351 S.W.3d at 549.

[62]  Tex. Gov't Code § 2001.174(1).

[63]  *See Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 565 (Tex. 2000) (citing *Charter Med.-Dallas*, 665 S.W.3d at 453); *City of El Paso v. Public Util. Comm'n*, 344 S.W.3d 609, 619 (Tex. App.—Austin 2011, no pet.); *Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd.*, 156 S.W.3d 91, 99 (Tex. App.—Austin 2004, pet. denied).

on questions of law—specifically, the construction and validity of PURA Sections 39.157(d)(6) and 39.157(d)(5) and the corresponding Rules 25.272(h)(2) and 25.272(h)(1). We review such issues de novo, even when they arise in the context of "substantial-evidence" review of administrative orders.[64]

We construe administrative rules and statutes the same way, as rules have the force and effect of statutes.[65] Our primary objective in statutory construction (and, therefore, also in construction of rules) is to ascertain and give effect to the drafters' intent.[66] We determine that intent from the plain meaning of the words chosen when it is possible to do so, using any definitions provided.[67] We consider the statutes or rules as a whole rather than their isolated provisions.[68] We presume that the enactment's language was chosen with care, with each word included (or omitted) purposefully.[69] Undefined terms are typically given their ordinary meaning, but if a different or more precise definition is apparent from a term's use in context, we apply that meaning.[70] If the text of the enactment is unambiguous, we adopt the interpretation supported by its plain language unless

---

[64] *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011).

[65] *See TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011) (citing *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999)).

[66] *See id.* at 439 (citing Tex. Gov't Code § 312.005 and *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 176 (Tex. 2004)).

[67] *See id.* (citing Tex. Gov't Code § 312.011(b)).

[68] *See id*. (citing *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004)).

[69] *See id.* (citing *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008)).

[70] *See id*. (citing *In re Hall*, 286 S.W.3d 925, 928–29 (Tex. 2009) (orig. proceeding)).

such an interpretation would lead to absurd results that the drafters could not possibly have intended.[71] However, if the text is ambiguous—i.e., there is more than one reasonable interpretation of it—we may be required to defer to an authoritative construction by the agency charged with the provision's enforcement that is reasonable and not inconsistent with the text of the provision.[72] Such deference is particularly appropriate where the statutes and rules at issue concern a matter within the specialized or technical expertise of the agency.[73]

As AEP REP seems to acknowledge, this is plainly a case in which we would be required to defer to the Commission's construction of any of the statutes or rule provisions at issue that we determine to be ambiguous. This case centers on competing constructions of the Code of Conduct rule and its underlying statutory authorization, and the Legislature has charged the Commission with administering that regime to the end of preventing "market power abuses and cross-subsidizations between regulated and competitive activities both during the transition to and after the introduction of competition,"[74] to the ultimate end of fostering and preserving the "fully

---

[71] *See id.* (citing *Mega Child Care*, 145 S.W.3d at 177); *see also Texas Coast Utils. Coal. v. Railroad Comm'n*, 423 S.W.3d 355, 356 n.16 (Tex. 2014) (noting that principles of deference to agency construction not implicated where statute at issue is unambiguous).

[72] *See Texas Citizens*, 336 S.W.3d at 628–30; *see also TGS–NOPEC*, 340 S.W.3d at 439 ("If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, . . . we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule.").

[73] *See Zimmer US, Inc. v. Combs*, 368 S.W.3d 579, 586 (Tex. App.—Austin 2012, no pet.) (deferring to Comptroller's reasonable interpretation of ambiguous tax statute); *cf. Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.) (declining to defer to agency interpretation on issue outside agency expertise) (citing 2B Norman J. Singer, *Statutes & Statutory Construction* § 49:04, at 23–24 (6th ed. 2000)).

[74] Tex. Util. Code § 39.157(d).

competitive electric power industry" that is the goal of chapter 39.[75] At the same time, however, the Legislature has also made clear that the point of these measures is to preserve competition, not merely to supplant competition with back-door re-regulation of market outcomes.[76] The precise line between the two will invariably pass through "gray areas" where its location must be ascertained through resort to specialized and technical expertise concerning the dynamics of the retail electric market and consumer behavior within it. Such inquiries lie within the delegated core competencies of the Commission and tend to be beyond the expertise of the judiciary.

In light of these principles, AEP REP in practical effect has the burden of demonstrating that the Commission's construction of the statutes and rules at issue is contrary to the unambiguous language of the provisions or is otherwise not among the reasonable constructions to which the provisions are susceptible.[77] This is so because we would give effect to the Commission's reasonable construction whether it be the sole reasonable construction (i.e., the provision unambiguously means what the Commission concluded it means) or because it is a reasonable

---

[75] *See id*. § 39.001(a).

[76] *See id*. § 39.001(c), (d).

[77] *See Texas Citizens*, 336 S.W.3d at 624 (noting that court "will generally uphold an agency's interpretation of a statute it is charged by the Legislature with enforcing, 'so long as the construction is reasonable and does not contradict the plain language of the statute.'" (quoting *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008) (quoting *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993))); *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747–48 (Tex. 2006) (noting that courts give some deference to agency's formal and reasonable interpretation of an ambiguous statute, but "alternative *unreasonable* constructions do not make a policy ambiguous").

construction of an ambiguous provision to which we should defer.[78]  Only if AEP REP fails to meet

this burden do we reach its constitutional complaint.[79]

**Preferential joint promotion?**

*Internal limitations*

Within its second issue, AEP REP argues that the Commission construed and

applied the prohibition against preferential joint advertising or promotional activities—i.e., PURA

Section 39.157(d)(6) and Rule 25.272(h)(2)—in a manner that is unreasonable and

contradicts the unambiguous texts of those provisions, even if they are viewed in isolation.  AEP

REP emphasizes the following textual features of Section 39.157(d)(6):  "The rules adopted under

this section shall ensure that . . . a utility does not conduct *joint* advertising or promotional activities

*with a competitive affiliate* in a manner that favors the competitive affiliate."[80]  The Legislature's

specification of "joint" activity "with a competitive affiliate," in AEP REP's view, reflects intent "to

prohibit only those advertising and promotional activities undertaken or produced ***together*** by ***both***

a utility ***and*** its competitive affiliates."  "At a minimum," AEP REP reasons, this language "implies

some concerted effort beyond the mere sharing of a brand name."

To similar effect, AEP REP emphasizes that Rule 25.272(h)(2), the Code of

Conduct rule implementing PURA Section 39.157(d)(6), provides that "[a] utility shall not

---

[78] *See Texas Citizens*, 336 S.W.3d at 628 (explaining that "we need not consider whether the Commission's [reasonable] construction is the only—or the best—interpretation in order to warrant our deference").

[79] *See In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) ("As a rule, we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds.").

[80] Tex. Util. Code § 39.157(d)(6) (emphases added).

engage in *joint* marketing, advertising, or promotional activities *of its products or services with those of a competitive affiliate* in a manner that favors the affiliate."[81]  AEP REP observes that Rule 25.272(h)(2) "[b]y its terms . . . prohibits joint marketing, advertising or promotion **only** if it concerns the 'products and services' of **both** the utility and the competitive affiliate."  "[A] brand name or logo," AEP REP reasons, "does not relate to any particular product or service," and "the mere sharing of a brand and logo by a utility and its competitive affiliate cannot constitute a violation of the Commission's joint advertising rule." AEP REP likewise emphasizes Rule 25.272(h)(2)(B)'s non-exclusive illustrative list of impermissible "joint marketing, advertising, or promotional activities":

> (B)    A utility shall not engage in joint marketing, advertising, or promotional activities of its products or services with those of a competitive affiliate in a manner that favors the affiliate.  Such joint marketing, advertising, or promotional activities include, but are not limited to, the following activities:
>
> (i)    acting or appearing to act on behalf of a competitive affiliate in any communications and contacts with any existing or potential customers;
> (ii)   joint sales calls;
> (iii)  joint proposals, either as requests for proposals or responses to requests for proposals;
> (iv)   joint promotional communications or correspondence, except that a utility may allow a competitive affiliate access to customer bill advertising inserts according to the terms of a commission-approved tariff so long as access to such inserts is made available on the same terms and conditions to non-affiliates offering similar services as the competitive affiliate that uses bill inserts;
> (v)    joint presentations at trade shows, conferences, or other marketing events within the State of Texas; and

---

[81]  16 Tex. Admin. Code § 25.272(h)(2) (emphases added).

29

(vi)    providing links from a utility's Internet web site to a competitive affiliate's Internet web site.[82]

These examples, in AEP REP's view, further confirm that the prohibition against preferential "joint marketing, advertising, or promotional activities" requires "some affirmative act beyond the mere sharing of a brand name or logo."

Furthermore, even if its "mere" shared branding could constitute "joint advertising" or "joint promotion" with the "AEP Texas" TDUs, AEP REP insists there has been no competent showing that these activities would "favor" it relative to its competitors, as both PURA Section 39.157(d)(6) and Rule 25.272(h)(2) require.[83]  This is so, AEP REP reasons, because the assessment of whether joint advertising or promotional activity "favors" the competitive affiliate requires "case-by-case" evaluation of the nature and effect of some specific, identifiable communication or act by TDUs and competitive affiliates.  The Commission's contrary construction, AEP REP further suggests, is tantamount to a pre-determination that "the mere presence of the shared AEP brand and logo transforms any communication—regardless of medium, content, or context—of either the AEP TDUs or AEP into 'joint advertising or promotional activities' that favor the AEP REP."  "Only after analyzing the full context of a particular communication," AEP REP insists, "can such a conclusion be drawn."

---

[82]  *Id.*

[83]  *See* Tex. Util. Code § 39.157(d)(6) (" . . . conducts joint advertising or promotional activities with a competitive affiliate *in a manner that favors the competitive affiliate*") (emphasis added); 16 Tex. Admin. Code § 25.272(h)(2)(B) (". . . engage in joint marketing, advertising, or promotional activities of its products or services with those of a competitive affiliate *in a manner that favors the affiliate*) (emphasis added).

Appellees respond that to the extent AEP REP would require proof of some specific joint advertisement or promotional activity that it either has planned with the "AEP Texas" TDUs or perhaps has even executed already, it overlooks that the Commission is not applying the prohibition against preferential "joint advertising or promotional activities," per se, to AEP REP's actual conduct, but instead is applying the prohibition as it is incorporated into Rule 25.107(e)(1), the limitations on permissible business names within the Commission's REP certification requirements.[84] Under Rule 25.107(e)(1), as appellees note, the Commission must deny an REP application to the extent the applicant requests to use business names that are "deceptive, misleading, vague," or "otherwise contrary" to the Code of Conduct.[85] That inquiry, appellees observe, necessarily focuses prospectively or even somewhat hypothetically on whether a proposed business name *will* deceive, mislead, confuse, or be "otherwise contrary" to the Code of Conduct, and cannot look to any actual communication or conduct by a yet-to-be-certified REP that has not started operating in the market under that certification. Thus, with regard to the Code of Conduct's ban on preferential joint promotion, appellees suggest, the Commission reasonably focused on whether AEP REP's proposed use of the AEP abbreviation and logo in common with the "AEP Texas" TDUs will result in violations of the ban, as opposed to requiring proof that entities have already formulated or issued some specific advertisement or promotion that does.

But more fundamentally, appellees urge that this case is about far more than "mere" shared branding, and they accuse AEP REP of overlooking or incorrectly portraying the Commission's findings of underlying fact and the evidence on which they were based. For one

---

[84] *See* 16 Tex. Admin. Code § 25.107.

[85] *See id*. § 25.107(e)(1).

31

thing, appellees emphasize, the Commission found that AEP REP had planned "to use AEP's red parallelogram corporate logo in conjunction with the business name AEP Retail Energy" as part of a "marketing strategy." Appellees similarly note the Commission's findings that the same AEP abbreviation and distinctive red parallelogram logo that AEP REP would wield while pursuing its "marketing strategy" is also shared in common with the "AEP Texas" TDUs; would be used "when advertising and promoting either AEP Retail Electric or AEP's Texas TDUs"; and is already "omnipresent in communities served by AEP Texas TDUs." The existence of this "marketing strategy," appellees reason, confirms the certainty that AEP REP would, if the Commission approved its Option 1 application, utilize the AEP name and distinctive red parallelogram logo—the identical name and logo that the "AEP Texas" TDUs have made "omnipresent" and would continue to wield—in specific advertisements and promotional activities aimed at the Texas retail electric "mass market."

What would make such communications "joint" advertisements and promotional activities "favoring" AEP REP within the meaning of PURA and its rules, appellees further explain, is the way retail consumers would likely understand and perceive the communications. Appellees cite the Commission's findings that the "marketing efforts of competitive affiliates with shared branding [with TDUs] have a greater potential for causing confusion among customers"—i.e., consumer misunderstanding as to which entity is the subject of an advertisement or promotion and the relationship between the two—and that "AEP Retail Energy and the AEP Texas TDUs['] sharing of identical AEP branding . . . will cause confusion among customers." In this regard, appellees emphasize the Commission's finding of underlying fact that "AEP Retail Electric," despite having never been used in marketing to customers, already ranked among the highest in familiarity

32

among customers and was familiar to 73 percent of customers in the "AEP Texas" service areas, the same percentage that were familiar with the "AEP Texas" name; that 32 percent of the customers in the "AEP Texas" service areas believed that "AEP Retail Energy" provides transmission and distribution services; and that over one third of Texas consumers believed that "the company that they buy electricity from also owns, maintains, and repairs the wires that deliver the electricity to their home." In this context, appellees further reason, the concurrent use of the AEP abbreviation and distinctive red parallelogram logo "when advertising and promoting either AEP Retail Energy or AEP's Texas TDUs" would both constitute "joint promotion" (inasmuch as consumers will tend to perceive that any "AEP Texas" promotion or advertising refers to AEP REP, and vice versa) and would "favor[] AEP Retail Energy over non-affiliated REPs" (inasmuch as the "confusion" would enable AEP REP's "marketing strategy" to leverage "AEP Texas" promotional and advertising activity, brand identity, and goodwill, and/or benefit from consumer misunderstanding regarding its relationship to the "AEP Texas" TDUs).

We agree with appellees that the Commission was reasonable in construing Rule 25.107(e)(1) to contemplate prospective evaluation of whether allowing an REP to use a particular business name would likely or potentially lead to Code of Conduct violations, as opposed to requiring proof that the REP has engaged or plans to engage in some specific communication that would violate the Code. Likewise, we concur with appellees' observations that the Commission made unchallenged findings to the effect that AEP REP, if certified under that business name, would actually be targeting retail consumers with specific advertisements and promotional activities utilizing the common, already-"omnipresent" "AEP" name and logo it would share with the "AEP Texas" TDUs. And as for whether those anticipated advertisements or promotions would run

33

afoul of the prohibition against preferential joint promotion, we reject AEP REP's view that PURA Section 39.157(d)(6) and Rule 25.272(h)(2), as incorporated into Rule 25.107(e)(1)(B), are not reasonably susceptible to the construction the Commission has given them.

The parties' competing contentions boil down to a dispute over the extent to which the provisions should be viewed from the perspective of the TDU and competitive affiliates versus that of the retail customers to whom the advertisements or promotions will be directed. While AEP REP insists that "joint" activities "with" or "favoring" a competitive affiliate or its products contemplate direct or overt attempts by a TDU to aid a competitive affiliate through its advertisements or promotions, the Commission maintains that the listener's perception and understanding must also be considered. The gravamen of the Commission's underlying fact findings is that the anticipated use of the shared AEP name, logo, and branding by AEP REP and the "AEP Texas" TDUs would, in the eyes of retail consumers, promote all of these entities and their products collectively and effectively leverage each entity's advertising, brand identity, and goodwill to the benefit of the others. It is in this sense that the Commission concluded that the contemplated shared branding would be "jointly" between and "with" AEP REP and the "AEP Texas" TDUs and "favor" AEP REP and its products in the manner contemplated by Section 39.157(d)(6) or Rule 25.272(h)(2). All other things being equal, we cannot conclude the Commission's approach is unreasonable or inconsistent with the texts of Section 39.157(d)(6) or Rule 25.272(h)(2), especially in light of the overarching purposes of the Code of Conduct. A central legislative concern underlying the Code of Conduct's requirements and limitations, as we have previously explained, is preventing "cross-subsidizations between regulated and competitive activities"—i.e., the leveraging of a TDU's assets

34

and monopoly position to aid an affiliate operating in a competitive market.[86]  Having found that the "AEP" name and branding would have the practical effect of promoting both the "AEP Texas" TDUs and AEP REP and leveraging each other's notoriety and goodwill to benefit the other, the Commission was not unreasonable in concluding that its use by AEP REP would effect the sort of subsidy from the "AEP Texas" entities to AEP REP that the Code of Conduct seeks to prohibit.[87]

In sum, if, as AEP REP argues, the Commission's construction of PURA Section 39.157(d)(6) and Rule 25.272(h)(2) is unreasonable or inconsistent with their unambiguous texts, it is not because of the language found solely within the "four corners" of those provisions. In that regard, AEP REP urges that the provisions' broader statutory context refutes, rather than supports, the Commission's view of the prohibition against preferential joint advertising or promotional activities.  In support, it chiefly emphasizes PURA Section 39.157(d)(5)(B) and the related Rule 25.272(h)(1).  Section 39.157(d)(5)(B), as previously noted, requires the Commission to promulgate Code of Conduct rules ensuring that a TDU does not "allow a competitive affiliate, before September 1, 2005, to use the utility's corporate name, trademark, brand, or logo unless the competitive affiliate includes on employee business cards and in its advertisements of specific services to existing or potential residential or small commercial customers locating within the

---

[86]  *Id*. § 39.157(d).

[87]  Contrary to the dissent's view, the Commission's findings regarding customer confusion do not interject "a factor not present anywhere in Section 39.157(d)(6) or Rule 25.272(h)(2)(B)." Slip op. at 8.  As the Commission reasoned, the findings of customer confusion go to the perceived potential impact of the shared branding and, in turn, whether it would run afoul of the prohibition against joint advertising or promotional activities, as incorporated into Rule 25.107(e)(1)(B).

35

utility's certified service area a disclaimer" described in the provision.[88]  Rule 25.272(h)(1), in turn, implements this requirement using materially identical language.[89]

In AEP REP's view, both Section 39.157(d)(5)(B) and Rule 25.272(h)(1) recognize that the very conduct the Commission determined to be prohibited preferential joint promotion—"[t]he sharing of the AEP acronym and AEP's red parallelogram logo by both AEP Retail Energy and its affiliated TDUs as described in this case"—is permissible in the first instance, and limited only by a requirement, now since expired, that any such shared branding used before September 1, 2005, be accompanied by a disclaimer.  And it follows, AEP REP reasons, that this same sharing of AEP branding cannot constitute prohibited preferential "joint promotion" under Section 39.157(d)(6) and Rule 25.272(h)(2) as the Commission determined, because that is the domain of Section 39.157(d)(5)(B) and Rule 25.272(h)(1).  Similarly, if the prohibition extended so broadly, AEP REP adds, it would render the disclaimer requirement a nullity from its inception, and statutes are not to be construed that way if reasonably possible to do otherwise.[90]  We turn to these arguments now.

---

[88]  Tex. Util. Code § 39.157(d)(5)(B).

[89]  *See* 16 Tex. Admin. Code § 25.272(h)(1).

[90]  *See* Tex. Gov't Code § 311.021 (Code Construction Act provision creating presumption that "the entire statute is intended to be effective"); *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003) (declining to read statute in way that would render some parts superfluous).

*Conclusions of law 2A and 2C*

As a threshold matter regarding the effect of Section 39.157(d)(5)(B) and Rule 25.272(h)(1), AEP REP challenges, in its first issue, the Commission's determinations, carried over as Conclusions of Law 2A and 2C in its final order, that "PURA § 39.157(d)(5)[(B)] does not apply to this docket because this statute only allows a competitive affiliate to use the same corporate name, trademark, brand, or logo as that of its affiliate TDU prior to September 1, 2005," and that "PURA does not address the shared use of business names after 2005." Contrary to these conclusions, AEP REP urges, only the disclaimer requirement imposed by PURA Section 39.157(d)(5)(B) ceased to operate on September 1, 2005—the remainder of the provision, and its implication regarding the permissibility of shared names and branding vis-a-vis the prohibited preferential joint advertising or promotional activities, continues in effect today.

To the extent the Commission's Conclusions of Law 2A or 2C assert that Section 39.157(d)(5)(B) expired in its entirety in 2005 or that the provision otherwise has no potential relevance to the scope or application of the preferential-joint-promotion prohibition under Section 39.157(d)(6) and Rule 25.272(h)(2), we agree with AEP REP that this construction is belied by PURA's unambiguous text. Contrary to what Conclusions of Law 2A and 2C seem to suggest, Section 39.157(d)(5)(B) is not a time-limited *authorization* for TDUs and competitive affiliates to share the TDU's "corporate name, trademark, brand or logo" only until September 1, 2005. Rather, it is only a *limitation* on the sharing of names and branding, and then only to the extent of requiring that a competitive affiliate not be allowed, "before September 1, 2005," to "use the [TDU's] corporate name, trademark, brand, or logo" without the specified disclaimer.[91]

---

[91] *See* Tex. Util. Code § 39.157(d)(5)(B).

These features of Section 39.157(d)(5)(B) have at least three important implications. First, whatever authority or freedom TDUs and competitive affiliates possess to share names, logos, or branding in the first instance must derive from law external to Section 39.157(d)(5)(B) itself. Second, Section 39.157(d)(5)(B) does not purport to alter or limit that underlying right or freedom except to the extent of imposing the disclaimer requirement. Third, the disclaimer requirement is made applicable only until September 1, 2005. That is the sole significance of Section 39.157(d)(5)(B)'s reference to that date—the rest of the provision remains "on the books" and effective today to the same extent it was when PURA Chapter 39 took effect in 1999 and when customer choice began in 2002. The Legislature knows how to craft an entire statute or provision so as to expire on a particular date,[92] and it plainly did not do this with regard to Section 39.157(d)(5)(B) except with respect to the disclaimer requirement. We must presume this choice was deliberate.[93]

The chief relevance of Section 39.157(d)(5)(B) at this juncture, as AEP REP maintains, is that it must inform construction of the prohibition against preferential joint-promotional activities that the Commission concluded AEP REP's shared branding would violate. Section 39.157(d)(5)(B) and the statutory source of the preferential joint-promotion prohibition, PURA Section 39.157(d)(6), are both components of subsection (d) of PURA Section 39.157, the list of seventeen paragraphs through which the Legislature prescribed the safeguards and prohibitions

---

[92] *See, e.g.*, Tex. Gov't Code § 531.0995(e) ("This section expires September 1, 2015."); Tex. Health & Safety Code § 325.006 ("This section expires April 1, 2014.").

[93] *See TGS–NOPEC*, 340 S.W.3d at 439 ("We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen.").

that the Commission was to include in its Code of Conduct rule.[94]  We are to construe such statutes as a whole and interpret them to give effect to every part.[95]  Consequently, the Legislature's inclusion of Section 39.157(d)(5)(B) in subsection (d) potentially informs the intended meaning and scope of the preferential "joint advertising or promotional activities" it intended to proscribe under Section 39.157(d)(6).  In particular, as AEP REP correctly urges, we must presume the Legislature did not intend Section 39.157(d)(6) to prohibit the entire universe of shared "use [of] the utility's corporate name, trademark, brand, or logo" that Section 39.157(d)(5)(B) presumes can occur, as otherwise Section 39.157(d)(5)(B) would be rendered a nullity, and we are not to construe the statutes that way if it is reasonably possible to do otherwise.[96]  And the same would be true regarding the relationship between Rule 25.272(h)(1) and Rule 25.272(h)(2), the rule provisions through which the Commission implemented Section 39.157(d)(5)(B) and Section 39.157(d)(6).

In sum, the Commission was not free simply to ignore PURA Section 39.157(d)(5)(B), the counterpart Rule 25.272(h)(1), and their potential implications when construing and applying the preferential joint-promotion prohibition under Section 39.157(d)(6) and Rule 25.272(h)(2), let alone do so based on an erroneous view that Section 39.157(d)(5)(B) in its entirety had expired in 2005.  To the extent Conclusions of Law 2A and 2C reflect such reasoning, they are contrary to PURA's unambiguous text, and we sustain AEP REP's first issue.

---

[94] *See* Tex. Util. Code § 39.157(d).  In fact, subsection 39.157(d)(5)(B) and subsection (d)(6) appear in adjacent paragraphs.  *See id.* § 39.157(d)(5)(B), (d)(6).

[95] *See Texas Citizens*, 336 S.W.3d at 628 (citing *City of San Antonio*, 111 S.W.3d at 25).

[96] *See* Tex. Gov't Code § 311.021; *City of San Antonio*, 111 S.W.3d at 29.

AEP REP urges that this error, in itself, requires that we reverse the Commission's order. But the APA instructs us to reverse the Commission's final order only if AEP REP's "substantial rights" were "prejudiced" by this error of law, and this requirement incorporates a harm analysis.[97] Similarly, as a general rule, we must affirm the Commission's order if the factual bases on which it relied support its decision under a different, valid legal theory.[98] Appellees suggest that we can affirm the Commission's final order based on an alternative theory regarding the interplay of Section 39.157(d)(5)(B) and Rule 25.252(h)(1) and the prohibition against preferential joint promotion. To summarize this theory:

(1)     Section 39.157(d)(5)(B) and Rule 25.252(h)(1) do not affirmatively authorize TDUs and competitive affiliates to share names, logos, or branding, but instead purport only to impose a temporary safeguard—the disclaimer requirement—on such sharing (as we have previously observed).

(2)     Whether the sharing of names, logos, or branding by a TDU and competitive affiliate is permissible in the first instance is governed by law external to Section 39.157(d)(5)(B) and Rule 25.252(h)(1) (as we have also observed).

(3)     That external law determining the permissibility of sharing names, logos, or branding in the first instance includes Rule 25.107(e)(1)'s requirements that an REP's "business name" not be "otherwise contrary" to the Code of Conduct—including not violating the prohibition against preferential joint advertising or promotion.

(4)     Consequently, the sharing of names, logos, or branding by a TDU and competitive affiliate may potentially run afoul of the prohibition against preferential joint advertising or

---

[97] *See* Tex. Gov't Code § 2001.174(2); *Nobles v. Employees Ret. Sys. of Tex.*, 53 S.W.3d 483, 489–90 (Tex. App.—Austin 2001, no pet.) (reviewing agency decision for reversible error and noting that, under section 2001.174, a showing of injury to the claimant is necessary before reversal is the appropriate remedy).

[98] *See Vista*, 416 S.W.3d at 25 (noting longstanding principle that "a reviewing court generally must affirm an administrative order 'if it is correct on any theory of law applicable to the case,' regardless of whether the agency purported to rely on that legal theory or even relied on an erroneous one") (citing *Gulf Land Co. v. Atlantic Ref. Co.*, 131 S.W.2d 73, 77 (Tex. 1939)).

40

promotion, or any other Code of Conduct limitations for that matter. The existence of the disclaimer requirement of Section 39.157(d)(5)(B) and Rule 25.252(h)(1), at most, reflects merely that the external prohibitions and limitations cannot *categorically* bar *all* sharing of names, logos, or branding contemplated by Section 39.157(d)(5)(B) and Rule 25.252(h)(1), as such a construction would make the provisions nullities. In short, whether sharing of names, logos, or branding violates an external prohibition or limitation depends on the *particular circumstances* presented—and those circumstances were found to exist here.

We agree that this legal theory, which is reflected in the Commission's Findings of Fact 26[99] and 27[100] and Conclusions of Law 2B[101] and 10,[102] would, if legally valid and supported by substantial evidence, provide logical support for the Commission's order independently from Conclusions of Law 2A and 2C.[103] Accordingly, we proceed to address further arguments advanced by AEP REP that challenge this theory, which are presented in the remainder of its second issue.

---

[99] "While a regulated utility and a competitive affiliate are not categorically prohibited by PURA and Commission rules from sharing the same or similar names, . . . ."

[100] "AEP Retail Energy and the AEP Texas TDUs['] sharing of identical AEP branding is joint promotion that will cause confusion among customers and result in favoring AEP Retail Energy over non-affiliated REPs."

[101] "Neither PURA § 39.157(d)(5)[(B)] nor P.U.C. Subst. R. 25.272[(h)(1)] preclude the Commission from determining pursuant to P.U.C. Subst. R. 25.107(e)(1)(B) whether a retail electric provider's name is deceptive, misleading, vague, or otherwise contrary to [the Code of Conduct]." While consistent with Conclusions of Law 2A and 2C, Conclusion of Law 2B is not necessarily limited to their erroneous rationales as to why Section 39.157(d)(5)(B) and Rule 25.272(h)(1) do not "preclude" the Commission from applying the requirements of Rule 25.107(e)(1)(B).

[102] "The sharing of the AEP acronym and AEP's red parallelogram logo by both AEP Retail Energy and its affiliated TDUs *as described in this case* violates the prohibition in PURA § 39.157(d)(6) [and] P.U.C. Subst. R. 25.272(h)(2) of joint advertising and promotional activities that favors a competitive affiliate." (Emphasis added).

[103] *See* Tex. Gov't Code § 2001.174(2); *Nobles*, 53 S.W.3d at 489–90 (harm analysis); *see also Montgomery*, 34 S.W.3d at 566 (noting that "label attached, 'finding of fact' or 'conclusion of law,' is not determinative").

*Structure of PURA § 39.157(d)*

AEP REP argues that the overall structure of subsection (d) of PURA Section 39.157—again, the subsection in which both Section 39.157(d)(5)(B) and Section 39.157(d)(6) appear—refutes the Commission's notion that the shared use of a common "corporate name, trademark, brand, or logo" by a TDU and competitive affiliate contemplated by PURA Section 39.157(d)(5)(B) and Rule 25.272(h)(1) could also potentially fall within the ambit of preferential "joint advertising or promotional activities" that are prohibited under Section 39.157(d)(6) and Rule 25.272(h)(2) in some circumstances. AEP REP reasons that subsection (d) as a whole is structured into seventeen paragraphs that each "address specific and distinct transactions and activities these rules must regulate" and that (d)(5)(B) and (d)(6) are placed in separate paragraphs. In AEP REP's view, this structure reflects legislative intent to distinguish, and to make mutually exclusive of one another, the sharing of a name, brand, or logo addressed by (d)(5)(B) and the preferential "joint advertising or promotional activities" prohibited by (d)(6). AEP REP adds that the two paragraphs do not explicitly mention each other, or the subject matter of the other, and infers that the Legislature would have included such language if it had intended the two provisions to overlap.[104] In response, appellees contend that nothing in subsection (d)

---

[104] AEP REP similarly argues that Section 39.157(d)(5)(B) must control over Section 39.157(d)(6) because the former is "more specifically" addressed to shared branding, while the latter speaks more "generally" to preferential joint advertising or promotional activities." *See Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 639 (Tex. 2010) (noting that, where statute is ambiguous, more "specific" statute controls over "general" one); *see also* Tex. Gov't Code § 311.026(b) (Code Construction Act provision requiring that, where there is irreconcilable conflict, specific statutory provision prevails as an exception over a conflicting general one). As appellees point out, this specific-versus-general construction principle operates only in the context of an irreconcilable conflict between two statutory provisions. *See* Tex. Gov't Code § 311.026(b); *DeQueen*, 325 S.W.3d at 639. And, appellees add, any such conflict between Section 39.157(d)(5)(B) and Section 39.157(d)(6) can be avoided by construing the two provisions

compels the conclusion that the shared branding contemplated in PURA Section 39.157(d)(5)(B) must be mutually exclusive of the "joint advertising or promotional activities" prohibited under Section 39.157(d)(6).

AEP REP's arguments regarding subsection (d)'s overall structure are ultimately unpersuasive. Although AEP REP is correct in observing that each of the seventeen paragraphs within subsection (d) differ in regard to the activity or practice that is its primary focus or emphasis, their overall structure falls short of demonstrating legislative intent that the subject matter of each paragraph be entirely distinct or mutually exclusive of the subject matter addressed in other paragraphs. This is readily apparent from a review of the seventeen paragraphs within subsection (d):

> The rules adopted under this section shall ensure that:
>
> (1)    a utility makes any products and services, other than corporate support services, that it provides to a competitive affiliate available, contemporaneously and in the same manner, to the competitive affiliate's competitors and applies its tariffs, prices, terms, conditions, and discounts for those products and services in the same manner to all similarly situated entities;
>
> (2)    a utility does not:
>
>     (A)    give a competitive affiliate or a competitive affiliate's customers any preferential advantage, access, or treatment regarding services other than corporate support services; or
>
>     (B)    act in a manner that is discriminatory or anticompetitive with respect to a nonaffiliated competitor of a competitive affiliate;

---

in the manner they advocate—to operate independently, such that shared branding is neither categorically prohibited nor categorically permissible under Section 39.157(d)(6). In short, AEP REP's reliance on the specific-versus-general concept does not singularly refute appellees' construction of Sections 39.157(d)(5)(B) and Section 39.157(d)(6), but merely begs the question.

(3) a utility providing electric transmission or distribution services:

   (A) provides those services on nondiscriminatory terms and conditions;
   (B) does not establish as a condition for the provision of those services the purchase of other goods or services from the utility or the competitive affiliate; and
   (C) does not provide competitive affiliates preferential access to the utility's transmission and distribution systems or to information about those systems;

(4) a utility does not release any proprietary customer information to a competitive affiliate or any other entity, other than an independent organization as defined by Section 39.151 or a provider of corporate support services for the purposes of providing the services, without obtaining prior verifiable authorization, as determined from the commission, from the customer;

(5) a utility does not:

   (A) communicate with a current or potential customer about products or services offered by a competitive affiliate in a manner that favors a competitive affiliate; or
   (B) allow a competitive affiliate, before September 1, 2005, to use the utility's corporate name, trademark, brand, or logo unless the competitive affiliate includes on employee business cards and in its advertisements of specific services to existing or potential residential or small commercial customers locating within the utility's certificated service area a disclaimer that states, "(Name of competitive affiliate) is not the same company as (name of utility) and is not regulated by the Public Utility Commission of Texas, and you do not have to buy (name of competitive affiliate)'s products to continue to receive quality regulated services from (name of utility).";

(6) a utility does not conduct joint advertising or promotional activities with a competitive affiliate in a manner that favors the competitive affiliate;

(7) a utility is a separate, independent entity from any competitive affiliates and, except as provided by Subdivisions (8) and (9), does not share employees, facilities, information, or other resources, other than permissible corporate support services, with those competitive affiliates unless the utility can prove to the commission that the sharing will not compromise the public interest;

(8)    a utility's office space is physically separated from the office space of the utility's competitive affiliates by being located in separate buildings or, if within the same building, by a method such as having the offices on separate floors or with separate access, unless otherwise approved by the commission;

(9)    a utility and a competitive affiliate:

    (A)    may, to the extent the utility implements adequate safeguards precluding employees of a competitive affiliate from gaining access to information in a manner inconsistent with Subsection (g) or (i), share common officers and directors, property, equipment, offices to the extent consistent with Subdivision (8), credit, investment, or financing arrangements to the extent consistent with Subdivision (17), computer systems, information systems, and corporate support services; and

    (B)    are not required to enter into prior written contracts or competitive solicitations for non-tariffed transactions between the utility and the competitive affiliate, except that the commission by rule may require the utility and the competitive affiliate to enter into prior written contracts or competitive solicitations for certain classes of transactions, other than corporate support services, that have a per unit value of more than $75,000 or that total more than $1 million;

(10)    a utility does not temporarily assign, for less than one year, employees engaged in transmission or distribution system operations to a competitive affiliate unless the employee does not have knowledge of information that is intended to be protected under this section;

(11)    a utility does not subsidize the business activities of an affiliate with revenues from a regulated service;

(12)    a utility and its affiliates fully allocate costs for any shared services, corporate support services, and other items described by Subdivisions (8) and (9);

(13)    a utility and its affiliates keep separate books of accounts and records and the commission may review records relating to a transaction between a utility and an affiliate;

(14)    assets transferred or services provided between a utility and an affiliate, other than transfers that facilitate unbundling under Section 39.051 or asset valuation under Section 39.262, are priced at a level that is fair and reasonable to the customers of the utility and reflects the market value of theassets or services or the utility's fully allocated cost to provide those assets or services;

(15)    regulated services that a utility provides on a routine or recurring basis are included in a tariff that is subject to commission approval;

(16)    each transaction between a utility and a competitive affiliate is conducted at arm's length; and

(17)    a utility does not allow an affiliate to obtain credit under an arrangement that would include a specific pledge of assets in the rate base of the utility or a pledge of cash reasonably necessary for utility operations.[105]

Areas of at least partial potential subject-matter overlap would appear to include, among others, the prohibitions against "discrimination" enumerated in (d)(1), (2), and (3); paragraph (d)(6)'s prohibition against preferential "joint advertising or promotional activities" and (d)(5)(A)'s prohibition against TDUs "communicat[ing] with a current or potential customer about products or services offered by a competitive affiliate in a manner that favors a competitive affiliate"; and (d)(11)'s prohibition against "subsidiz[ing] the business activities of an affiliate with revenues from a regulated service," which would appear to overlap with or be a core concern underlying numerous other paragraphs.

Considering the existence of such subject-matter overlap among its component paragraphs, the structure of subsection (d) as a whole belies legislative design that each individual paragraph address only some practice or concern that is entirely separate and distinct from that

---

[105]  Tex. Util. Code § 39.157(d).

addressed in the other paragraphs.[106]  This structure also reveals—and it is perhaps axiomatic—that

the mere fact that a particular practice is permitted (or at least not prohibited) by one paragraph does

not preclude it from running afoul of one or more other paragraphs.  Consequently, this statutory

structure does not compel AEP REP's conclusion that any sharing of branding that is addressed by

PURA Section 39.157(d)(5)(B) cannot potentially also fall within the ambit of preferential joint

advertising or promotional activities prohibited under Section 39.157(d)(6).  Instead, the structure

is consistent with the Commission's view that shared branding is independently subject to—and can

potentially run afoul of—the prohibition against preferential joint advertising or promotional

activities or other Code of Conduct provisions external to Section 39.157(d)(5)(B).

### Underlying findings

Finally, AEP REP argues that the Commission's underlying findings demonstrate

that the agency effectively reads Section 39.157(d)(5)(B) out of PURA, a construction that is

thereby unreasonable and inconsistent with the statutory text.  As AEP REP observes, the analytical

linchpin of the Commission's order is its findings regarding the extent of "confusion" among

retail customers concerning the respective identities and roles of AEP REP and the "AEP Texas"

TDUs and the relationship between those entities.  The problem with the Commission's reasoning,

AEP urges, is that this same sort of customer confusion would have existed before the inception

of competition in 2002 and would have been anticipated by the Legislature when it crafted

---

[106] *See In re Estate of Nash*, 220 S.W.3d 914, 917–18 (Tex. 2007) ("While we recognize that we should avoid, when possible, treating statutory language as surplusage, . . . there are times when redundancies are precisely what the Legislature intended."); *In re City of Georgetown*, 53 S.W.3d 328, 336 (Tex. 2001) (orig. proceeding) (noting that statutory redundancies may mean that "the Legislature repeated itself out of an abundance of caution, for emphasis, or both").

PURA chapter 39. And such "confusion among customers," AEP REP posits, would have been far worse prior to and at the inception of competition compared to today. Whereas today—following a decade of competition—consumers may purchase electric products and services from approximately thirty REPs vying for business in the "AEP Texas" service areas, the situation confronted by the Legislature in S.B. 7, AEP REP observes, was a retail electric market that would be opening to competition for the first time and in which consumers had typically known only the name and branding of the single monopoly provider that had served their area, in some instances for decades. Under the transitional scheme the Legislature prescribed, AEP REP adds, the names and branding of the exclusively dominant integrated utility could live on as those of the incumbent TDU.

If the sort of "confusion among customers" the Commission found here can make the otherwise-permissible sharing of names and branding by a TDU and competitive affiliate into illegal "joint promotion" or "joint advertising," AEP REP reasons, one cannot fathom any sharing of branding occurring at the inception of competition that would not have run afoul of the same prohibition. Consequently, AEP REP insists, the Commission's construction and application of the joint-promotion prohibition contradicts PURA's unambiguous text because it would render Section 39.157(d)(5)(B) a nullity from its inception. Instead, AEP REP argues, the prohibition against preferential "joint promotion" or "joint advertising" must apply to something more than mere shared branding. Nor can it be enough that TDUs and competitive affiliates might derive some competitive benefit from each other's use of shared branding, AEP REP further suggests, because a fundamental purpose of using *any* "corporate name, trademark, brand, or logo," as Section 39.157(d)(5)(B) contemplates TDUs and competitive affiliates would jointly do, is to build

48

and leverage brand identity and goodwill,[107] and the Legislature can be presumed to have understood this basic reality of intellectual property law and of the marketplace when crafting that provision.[108]

AEP REP adds that Section 39.157(d)(5)(B)'s disclaimer requirement represents a specific, limited remedy that the Legislature prescribed for the sort of customer confusion the Commission found. Consequently, AEP REP reasons, we should presume the Legislature did not intend some different, inconsistent remedy, let alone to empower the Commission to devise one.[109]

Although AEP REP's arguments have some initial intuitive appeal, closer examination reveals a critical flaw in their underlying premises, as appellees point out. Namely, when enacting PURA chapter 39, the Legislature would have anticipated that any use of shared branding at the inception of competition would have been accompanied by a panoply of transitional measures it imposed within the chapter that would reduce or limit the extent of competitive advantage that an incumbent REP could derive from the strategy. These would have included not only the price to beat,[110] but measures aimed specifically at ameliorating any underlying

---

[107] *See S.C. Johnson & Son v. Johnson*, 116 F.2d 427, 429 (2d Cir. 1940) (discussing purposes of trademark law, including regarding expansion into other areas) (Learned Hand, J.); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 3.2 (4th ed. 1996) (describing purposes of trademarks and noting that, among other things, trademarks can serve to designate the source from which all goods bearing the mark come or are controlled by a single source, to show that products are of equal quality, and to promote and assist in sales).

[108] *See* Tex. Gov't Code § 311.023 (Code Construction Act provision allowing court to consider circumstances under which statute enacted); *Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.) (citing *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990)).

[109] *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 629 (Tex. 2008) (relying on statutory-construction principles to hold that where plain language of statute provides one remedy, that is only remedy available); *Cities of Corpus Christi*, 188 S.W.3d at 702.

[110] *See* Tex. Util. Code § 39.202; *Office of Pub. Util. Counsel*, 104 S.W.3d at 229.

customer confusion, such as educational programs to inform retail consumers about the structure of the revamped electric market and the respective roles of market participants[111]—and Section 39.157(d)(5)(B)'s disclaimer requirement itself. These observations, in turn, have at least two important implications that cut against AEP REP's reasoning. First, they tend to undermine AEP REP's assumption that the Legislature could have anticipated only a degree or extent of customer confusion (and potentially resultant anti-competitive impact from shared branding) present at the inception of competition that is greater than that which the Legislature would have expected today. Second, and more importantly, they inform our perception of the Legislature's intent and understanding concerning the relationship between Section 39.157(d)(5)(B) and the prohibition against preferential joint advertising or promotional activities. Specifically, while it may be true that the prohibition cannot be construed to extend to all shared branding that is *accompanied by the disclaimer and other ameliorative measures in effect during competition's early years*, lest it render Section 39.157(d)(5)(B) a nullity, this would not necessarily be true of applying the prohibition to shared branding after that time.

AEP REP urges that such a construction of PURA and the corresponding rules would be unreasonable, insisting that the Legislature could not possibly have intended the Code of Conduct to be more restrictive toward shared branding today than in competition's early years. Appellees answer that whether shared branding amounts to prohibited preferential joint advertising or promotion, both at the inception of competition and today, turns on the specific factual

---

[111] *See* Tex. Util. Code § 39.302 (requiring PUC to implement an education program to inform customers "about changes in the provision of electric service resulting from the opening of the retail electric market and the customer choice pilot program under this chapter").

circumstances, and the presence or absence of the disclaimer itself or other ameliorative measures may be considered. They further emphasize that the Legislature imposed the Code of Conduct, and charged the Commission with its enforcement, expressly to prevent "market power abuses and cross-subsidization between regulated and competitive activities both during the transition to and *after the introduction of competition*,"[112] reflecting its anticipation that the need for such oversight would continue past the initial transition period. We cannot conclude that appellees' view of the statutory scheme is unreasonable or inconsistent with PURA or the Code of Conduct rule.[113] We overrule AEP REP's second issue.

**Constitutional issues**

In its third issue, AEP REP argues that the Commission's construction of PURA and the Code of Conduct rule violates (or would violate[114]) its freedom of speech under article V, section 8, of the Texas Constitution[115] and the First Amendment to the United States Constitution.[116]

---

[112]  Tex. Util. Code § 39.157(d) (emphasis added).

[113]  AEP REP also suggests that the Commission's order is contrary to prior decisions, arguing that "on multiple occasions prior to the expiration of the disclaimer requirement, the Commission authorized a REP and its affiliated TDU to share a brand." As appellees point out, the records of those proceedings are not before us here and, even if they were, our review here is still limited to assessing the reasonableness of the Commission's actions in the specific circumstances of this case. *See Reliant Energy, Inc. v. Public Util. Comm'n*, 153 S.W.3d 174, 199–200 (Tex. App.—Austin 2004, pet. denied).

[114]  *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 873 (Tex. 2000) ("If possible, we interpret a statute in a manner that renders it constitutional."); *see also* Tex. Gov't Code § 311.021(1) (presumption that the Legislature intended statute to comply with constitutional requirements).

[115]      Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the

51

It places primary reliance on the Texas provision, as construed by the Texas Supreme Court in the 1992 *Davenport v. Garcia* decision.[117] In *Davenport*, a unanimous court struck down a judicial "gag order" for violating constitutional free-speech rights, but the case's chief significance is that a five-member majority eschewed reliance on First Amendment jurisprudence in favor of fashioning, and relying exclusively upon, a separate and independent analysis under the Texas free-speech provision.[118] In addition to embracing a perceived jurisprudential "trend" at the time "toward . . . 'state constitutionalism' and 'new federalism,'"[119] the majority inferred from certain textual distinctions[120] and "Texas's strong and longstanding commitment to free speech"[121] that article I,

---

> press. In prosecutions for the publication of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

Tex. Const. art. I, § 8.

[116] *See* U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."); *see also Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 600 (Tex. 2013) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), for proposition that the "First Amendment is applicable to the states through the Fourteenth Amendment").

[117] 834 S.W.2d 4 (Tex. 1992).

[118] *See id*. at 7–23 (Doggett, J., joined by Gonzalez, Mauzy, Hightower, & Gammage, JJ.); *cf. id*. at 25–44 (Hecht, J., joined by Cook & Cornyn, JJ., concurring) (advocating reliance on "more fully developed First Amendment law" instead).

[119] *Id*. at 12.

[120] *See id*. at 9 (suggesting that first sentence of Texas provision—"Every person shall be at liberty to speak, write and publish . . . "—is an "affirmative grant of free speech" that is "more

section 8 of the Texas Constitution is "broader" and "provides greater rights of free expression than its federal equivalent."[122] From these premises, the majority derived a "presumption . . . that pre-speech sanctions or 'prior restraints' are unconstitutional"[123] and can withstand scrutiny only if there are "specific findings supported by evidence" of "(1) an imminent and irreparable harm to the judicial process [that] will deprive litigants of a just resolution of their dispute," and (2) that the restraint is the "least restrictive means" to prevent that harm.[124]

AEP REP characterizes the Commission's denial of its application for "Option 1" certification under the "AEP Retail Electric" name and branding as a "prior restraint" that is governed by the *Davenport* analysis and fails scrutiny under it. Appellees respond that the Commission's order instead implicates AEP REP's conduct or, at most, its "commercial speech," and is thus appropriately scrutinized under the analysis prescribed by the United State Supreme Court in its *Central Hudson* decision.[125] Under the *Central Hudson* line of cases, the Supreme Court has held that the First Amendment implications of regulation of "commercial speech"—"expression related solely

---

broadly worded than the [F]irst [A]mendment" (quoting *O'Quinn v. State Bar of Tex.*, 763 S.W.2d 397, 402 (Tex. 1988)).

[121] *See id*. at 7–10 (citing, among other indicia, the Mexican government's jailing of Stephen F. Austin "for his outspokenness in personally carrying . . . remonstrances to Mexico City").

[122] *Id*. at 9–10.

[123] *Id*. at 9.

[124] *Id*.

[125] *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980).

to the economic interests of the speaker and its audience"[126]—should be evaluated under the following four-part test:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.[127]

The Supreme Court has reasoned that commercial speech warrants this less exacting First Amendment scrutiny compared to other types of speech because, among other distinctions, commercial speech is driven by business profits and is carefully calculated, and is thus less likely to be inhibited by proper regulation.[128] These characteristics of commercial speech, the court has further reasoned, "may also make inapplicable the prohibition against prior restraints."[129]

Although insisting that the *Davenport* analysis applies here, AEP REP does not dispute that its use of the "AEP Retail Electric" name and branding would constitute "commercial speech" as defined by *Central Hudson*. And while the *Central Hudson* framework is grounded in the First Amendment, this Court has previously held that it, not the *Davenport* analysis, also governs

---

[126] *Id*. at 561.

[127] *Id.* at 566.

[128] *Friedman v. Rogers*, 440 U.S. 1, 10 (1979).

[129] *Id*. (citing *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 n.24 (1976) (Stewart, J., concurring)).

challenges under the Texas Constitution to regulations implicating communications that constitute "commercial speech" under *Central Hudson*.[130]  We see no reason to depart from these precedents here.  In the decades since it decided *Davenport*, the Texas Supreme Court has, to say the least, greatly refined its notion that the Texas free-speech provision is "broader" or more protective of speech than its federal counterpart.  While continuing to apply a version of a least-restrictive-means analysis to injunctive restraints of speech, the court has reasoned that this approach is not only required by Article I, Section 8, but by the First Amendment as well.[131]  More importantly here, the supreme court has emphasized that even if the Texas provision might be "broader" in some aspects of speech protections than the First Amendment, it does not necessarily follow that it is "broader" in all others,[132] and in some aspects it may actually be *less* protective of speech than its federal

---

[130]  *See Amalgamated Acme Affiliates, Inc. v. Minton*, 33 S.W.3d 387, 393–95 (Tex. App.—Austin 2000, no pet.); *accord Anderson Courier Servs. v. State*, 104 S.W.3d 121, 124 n.3 (Tex. App.—Austin 2003, pet. denied).

[131]  *See Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc.*, 975 S.W.2d 546, 557–60 (Tex. 1998).

[132]  *See Bentley v. Bunton*, 94 S.W.3d 561, 577–78 (Tex. 2003) (distinguishing aspects implicated by speech restrictions addressed in *Davenport* from aspects applicable to defamation liability); *see also Ex parte Tucci*, 859 S.W.2d 1, 16 (Tex. 1993) (Phillips, C.J., concurring) ("[C]omparative breadth is not a one-dimensional concept.  In the free expression context, for example, a constitutional provision may be 'broad' or 'narrow' on at least six axes, including: 1) the types of expression deemed protected, 2) the range of potential infringers against which the provision is operable, 3) the range of potential persons and entities who may invoke the protection, 4) the type of permissible restrictions and sanctions on free expression, 5) the degree of importance necessary for a competing interest or right to restrict free expression, and 6) how narrowly the infringement on free expression must be tailored to accommodate that competing interest or right.  Thus, to pronounce one free expression clause as broader than another is, standing alone, of little help.").

counterpart.[133]  Consequently, whether "Article I, Section 8 [is] more protective of speech . . . than

the First Amendment" in a particular application or context "must be because of the text, history,

or purpose of the provision, not just simply *because*."[134]  Absent such a demonstrated basis for

construing the Texas provision differently, the supreme court has further reasoned, "we limit our

analysis to the First Amendment and simply assume that its concerns are congruent with those of

[A]rticle I, [S]ection 8."[135]  AEP REP has demonstrated no reason why we should do otherwise in

regard to the commercial speech at issue here.  Accordingly, we will analyze its challenges under the

*Central Hudson* framework.

AEP REP contends that the Commission's order fails to pass muster even under the

less restrictive *Central Hudson* analysis.  We disagree.  The threshold requirement in the *Central

Hudson* test is that the speech not be "unlawful" or "misleading."[136]  As the *Central Hudson* Court

explained, "there can be no constitutional objection to the suppression of commercial messages

that do not accurately inform the public about lawful activity.  The government may ban forms of

communication more likely to deceive the public than to inform it . . . ."[137]  Thus, "the government

---

[133]  *See Bentley*, 94 S.W.3d at 578 (suggesting that "[i]f anything, in the context of defamation, the First Amendment affords more protection." (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 116–17 (Tex. 2000)).

[134]  *Operation Rescue-Nat'l*, 975 S.W.2d at 559 (emphasis in original); *accord Bentley*, 94 S.W.3d at 577–78.

[135]  *Bentley*, 94 S.W.3d at 579.

[136]  *Central Hudson*, 447 U.S. at 563–64.

[137]  *Id.* at 563.

may freely regulate commercial speech that . . . is misleading."[138]  One rationale for this is that there is no value to consumers or society for misleading or deceptive commercial speech.[139]

The essence of the Commission's underlying fact findings is that AEP REP's use of the name "AEP Retail Electric" and related branding would be misleading in the context of Texas's competitive retail electric market.  The Commission found that "AEP Retail Energy and the AEP Texas TDUs['] sharing of identical AEP branding is joint promotion that will *cause confusion* among customers and result in favoring AEP Retail Energy over non-affiliated REPs."  (Emphasis added.)  Specifically, there was evidence that allowing AEP REP to sell electricity in the Texas retail market as "AEP Retail Electric," with the same "AEP" identifier and logo as the "AEP Texas" TDUs would tend to cause retail and small commercial customers to perceive incorrectly that "AEP Retail Electric" and "AEP Texas" were one and the same or that customers of "AEP Retail Electric" otherwise stood to benefit from that company's affiliation with the TDU—e.g., perceiving that the affiliation would enable the customer to obtain more reliable service or more responsive restoration of service following an outage.[140]  Accordingly, it is not entitled to First Amendment protection.[141]

---

[138]  *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995).

[139]  *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 496 (1995) (Stevens J., concurring) ("[F]alse or misleading speech in the commercial realm also lacks the value that sometimes inheres in false or misleading political speech.").

[140]  *See id.* (noting consequences of misleading commercial speech, including that consumers may purchase products that do not work as advertised); *see also Friedman*, 440 U.S. at 15 (in upholding Texas's statutory prohibition against use of trade names by optometrists, noting that use of trade names "gave a misleading impression of competitive ownership and management" and "conveyed the impression of standardized" services).

[141]  *Central Hudson*, 447 U.S. at 566.

AEP REP decries this rationale as the sort of "paternalist approach" to consumer protection that the Supreme Court has repeatedly rejected in commercial-speech cases.[142] For example, in *Thompson*, the Supreme Court held unconstitutional a ban on advertising and promoting certain compounded drugs, which the government had insisted was necessary to prevent consumers who did not need the drugs from convincing the doctors to prescribe them anyway, rejecting "the notion that the Government has an interest in preventing the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information."[143] Similarly, in *Virginia State Board of Pharmacy*, the Supreme Court held unconstitutional a ban on the advertisement of prescription drug prices, which the government contended was necessary to protect the pharmacist-customer relationship and the customers' respect for the pharmaceutical profession. In determining that the ban was unconstitutional, the Supreme Court reasoned that concerns about the possible effect on consumers from truthful information about lawful activity was not a legitimate justification for suppressing prescription-drug price information.[144] But unlike these cases where the governmental body was trying to suppress truthful information about a lawful activity to protect the consumers from making "bad choices," here

---

[142] *See Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 374 (2002) (rejecting "notion that the Government has an interest in preventing dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information"); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 502–03 (1996) (holding unconstitutional a ban on advertising and describing such bans as being based on "the offensive assumption that the public will respond 'irrationally' to the truth"); *Virginia State Bd. of Pharm.*, 425 U.S. at 770 (describing advertising ban at issue as "highly paternalistic approach" to protecting consumers).

[143] *Thompson*, 535 U.S. at 374.

[144] *Virginia State Bd. of Pharm.*, 425 U.S. at 770.

the Commission is restricting shared branding between monopolistic TDUs and their affiliates in an effort to level or protect the playing field—the competitive retail electric industry—and foster competition that would, in turn, benefit the consumers. Stated another way, the PUC's shared-branding regulation is not concerned with influencing consumers' decisions in a competitive market, but rather with ensuring that their decisions are not influenced in a manner that undermines competition itself. And based on a similar rationale, the Supreme Court held in *Friedman v. Rogers* that Texas's ban on use of trade names by optometrists did not violate the First Amendment:

> We emphasize, in so holding, that the restriction on the use of trade names has only the most incidental effect on the content of the commercial speech of Texas optometrists. As noted above, a trade name conveys information only because of the associations that grow up over time between the name and a certain level of price and quality of service. Moreover, the information associated with a trade name is largely factual, concerning the kind and price of the services offered for sale. Since the Act does not prohibit or limit the type of informational advertising held to be protected in *Virginia Pharmacy* . . . , the factual information associated with trade names may be communicated freely and explicitly to the public. An optometrist may advertise the type of service he offers, the prices he charges, and whether he practices as a partner, associate, or employee with other optometrists. Rather than stifling commercial speech, [the prohibition] ensures that information regarding optometrical services will be communicated more fully and accurately to consumers than it had been in the past when optometrists were allowed to convey the information through unstated and ambiguous associations with a trade name. In sum, Texas has done no more than require that commercial information about optometrical services "appear in such a form . . . as [is] necessary to prevent its being deceptive."[145]

> We overrule AEP REP's third issue.

---

[145] *Friedman*, 440 U.S. at 15 (citing *Virginia State Bd. of Pharm.*, 425 U.S. at 772 n.24).

## CONCLUSION

We affirm the district court's judgment affirming the Commission's final order.

_____
Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Field;
   Dissenting Opinion by Justice Field

Affirmed

Filed:  July 17, 2014