

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00227-CV

THE STATE OF TEXAS AND GREG
ABBOTT, IN HIS OFFICIAL
CAPACITY AS ATTORNEY
GENERAL OF THE STATE OF
TEXAS

APPELLANTS AND APPELLEES

V.

VALERIE SAXION, INC. AND
VALERIE SAXION, INDIVIDUALLY

APPELLEES AND APPELLANTS

----------

### FROM THE 348TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 348-254931-11

----------

## OPINION

----------

## I. Introduction

In two issues in this accelerated interlocutory appeal, Appellants the State

of Texas and Greg Abbott, in his official capacity as Attorney General of the State

of Texas (collectively, the State) argue that the trial court erred by denying their

plea to the jurisdiction on the Free Exercise and federal Religious Freedom Restoration Act (RFRA) claims of Appellees Valerie Saxion, Inc. and Valerie Saxion, individually (collectively, Saxion). *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(5), (8) (West 2008 & Supp. 2014). The State presents this as a case about false and misleading labeling made in connection with the sale of dietary supplements in the Texas market.

In two issues in her cross-appeal, Saxion counters that the trial court erred by denying her motion for summary judgment on her counterclaims and affirmative defenses and characterizes the case as one involving religious speech infringed upon by government persecution.

Concluding that Saxion's cross-appeal does not fall under civil practice and remedies code section 51.014(a)(6), we dismiss the cross-appeal for want of jurisdiction. *See id.* § 51.014(a)(6) (West 2008 & Supp. 2014). And we reverse the trial court's judgment on the State's plea to the jurisdiction with regard to Saxion's free exercise and federal RFRA claims, render a judgment of dismissal for the State on these claims, and remand this case to the trial court for further proceedings.

## II. Factual and Procedural Background

The State sued Saxion for violations of the Texas Food, Drug, and Cosmetic Act (TFDCA) and the Deceptive Trade Practices Act (DTPA), listing page after page of allegations regarding Saxion's explicit and implicit statements—"on the internet, in labeling, and in promotional materials, including

2

product catalogues and newsletters"—about the ability of her dietary supplements to diagnose, mitigate, treat, cure, and prevent disease.[1] *See* Tex. Health & Safety Code Ann. §§ 431.047, .0585 (West 2010); Tex. Bus. & Com. Code Ann. §§ 17.41, .46(a)–(b) (West 2011). The State also alleged that Saxion promoted herself as a "naturopathic" doctor, which Texas does not recognize, and stated that

> any use of terms like "Doctor" or "Dr." with VALERIE SAXION'S name or derivative of her name on the label, in labeling, or in advertising in Texas constitutes false advertising under both the

[1]In the State's original petition, filed August 29, 2011, and in its first amended petition, filed April 11, 2012, the State alleged in paragraph 14 that Saxion promoted her products "through a television show entitled 'Alternative Health,'" and asked in paragraph 42(j) that Saxion be enjoined from "[m]aking claims, either explicitly or implicitly, to diagnose, mitigate, treat, cure, or prevent disease for dietary supplements through any means, including, but not limited to, websites, product labels and brochures, catalogs, *television programs or advertisements, radio programs or advertisements*; third party vendors; and third party websites." [Emphasis added.]

However, television and radio were not mentioned in the State's live pleading, filed January 11, 2013, which was before the trial court at the time of the April 5, 2013 hearings on the various motions at issue here. Paragraph 14 of the live pleading stated, "Defendant VALERIE SAXION promotes VALERIE SAXION, INC.'S products on the internet, in labeling, and in promotional materials, including product catalogues and newsletters." Paragraph 47(j) of the live pleading asked that Saxion be enjoined from

[m]aking claims, either explicitly or implicitly, to diagnose, mitigate, treat, cure, or prevent disease for dietary supplements through any means, including, but not limited to, websites, product labels and brochures, catalogs, advertisements, third party vendors, and third party websites unless the claims meet the requirements of a health claim or qualified health claim, structure/function claim, or nutrient claim authorized by federal regulation or are otherwise permitted by the Federal Food and Drug Administration.

TFDCA and the DTPA as this use implies directly or indirectly that Defendant VALERIE SAXION is a degreed doctor and/or authorized to practice medicine in Texas.

The State concluded its petition with the allegation that

[b]ased on the findings in paragraphs 16 through 27 above, incorporated herein by reference, Defendants have manufactured, held, offered for sale, distributed, sold, and/or introduced into commerce in Texas unapproved new drugs, misbranded drugs and foods, and falsely represented that these unapproved new drugs or misbranded foods could treat, mitigate, cure, or prevent various diseases. Defendants have also manufactured foods within Texas without a food manufacturer's license for each name listed as a manufacturer on the label.

The State contended in its petition's conclusion that Saxion's products fell under the auspices of the TFDCA and violated it because they had not been approved by the federal Food and Drug Administration (FDA), they were misbranded, and their labels were false or misleading. And it contended that in the course of trade and commerce, Saxion had engaged in false, misleading, and deceptive acts and practices that were unlawful under the DTPA.

The State sought an injunction against Saxion to stop her from engaging in the practices set out in its petition—a comprehensive list of twenty-four activities pertaining to, among other things, misbranding, misrepresentation, and mislabeling by failing to disclose that claims to diagnose, mitigate, treat, cure, or prevent disease cannot legally be made for dietary supplements[2] and in other

---

[2]The State included in its petition the following claims by Saxion with regard to her products, and Saxion admitted in her responses to the State's requests for admissions that she had made these statements:

4

manners; representing that a person has a sponsorship, approval, status, affiliation, or connection that she does not have by using the title "Doctor," or the abbreviation "Dr."; making misleading claims, either explicitly or implicitly, to diagnose, mitigate, treat, cure, or prevent disease for dietary supplements through any means, "including, but not limited to, websites, product labels and brochures, catalogs, advertisements, third party vendors, and third party websites unless the claims meet the requirements of a health claim or qualified

- "CLA has been shown to have strong anti-cancer properties. Especially in inhibiting breast and prostate tumors as well as colorectal, stomach and skin cancer, including melanoma . . . . CLA even lowered cancer cell growth. CLA is an excellent inhibitor of tumor growth."

- "The primary therapeutic applications for 5-HTP is [sic] low serotonin states. Conditions associated with low serotonin levels helped by 5-HTP are Depression, Obesity, Carbohydrate craving, Bulimia, Insomnia, Narcolepsy, Sleep apnea, Migraine headaches, Tension headaches, Chronic daily headaches, Premenstrual syndrome, and Fibromyalgia."

- "A partial list of bacteria/viruses tested and neutralized with Colloidal Silver in the laboratory were: Lyme disease, Herpes, Legionnaire, Staphylococcus[,] Aureas, Salmonella, Choleraesuis, Streptococci, Warts, Pseudomonas[,] Aeruginosa, Neisseria, Gonorrhea, Gardnerella Vaginalis, Gangrene and Candida. It is great for BURNS and CUTS, too."

- Regarding "Dr. Val's JC360 Graviola": "Derived from the Soursop tree, research indicates this is a nutrient that can help the body fight inferior cells, making it a great addition to a complete cancer program. It has many other uses, including fever, influenza, and immune support."

5

health claim, structure/function claim, or nutrient claim authorized by federal regulation or . . . otherwise permitted by" the FDA; and disseminating false advertisements.

Saxion counterclaimed for declaratory and injunctive relief against the State of Texas and against Gregg Abbott "in his official capacity as Attorney General," asserting that her statements were based on her sincerely held religious beliefs and arguing, among other things, that the State's suit implicated her free exercise and free speech rights and her corresponding rights under the state constitution. Saxion nonetheless admitted in her pleadings that the speech to which she referred was "not contained on the labels of her products."

In support of her religious-message argument, Saxion pointed to certain passages from a book she had authored:

> 1. Realize there is a problem! The first step to utilizing your spiritual authority over food or whatever has a hold on you is admitting you have a problem.
>
> 2. Ask for the Holy Spirit's help! Ask the Holy Spirit to reveal anything that is not pleasing to Him. If you really want to be free, listen when he answers. You may be surprised what he reveals to you.
>
> 3. Repent! Ask the Lord to forgive you for allowing food to have such a strong hold on your life, and thank Him for [s]howing you this area of your life that needs work. Don't beat yourself up over it. Just repent and receive God's forgiveness and love.
>
> . . . .
>
> *God has placed herbs, minerals and vitamins for us to understand and utilize to maintain health and regain health[.] He [h]as instructed*

6

*man through His Word on how to utilize these for our personal wellness.* [Emphasis added.]

Saxion contended that she needed protection from state action that deprived or substantially burdened her free exercise of religion under the First Amendment, under the federal RFRA, and under the state constitution.

Saxion sought a declaratory judgment that her statements were not illegal under the TFDCA, DTPA, or any state law; that the "Federal FDCA as amended by DSHEA [the Dietary Supplemental Health Education Act]" expressly or impliedly preempted the State's TFDCA and DTPA claims; that her due process rights would be violated if civil monetary penalties or an injunction were imposed on her under the TFDCA or DTPA; and that her equal protection and First Amendment rights would be violated by an injunction for the State. She also sought a prohibitory injunction against the attorney general "in his official capacity, and officers, agents[,] appointees[,] and employees of the State of Texas from enforcing Tex. Pen[al] Code [section] 31.52" against her; from censoring or threatening to censor her by prior restraint; or from imposing or threatening to impose civil monetary penalties or damages with regard to her rights of free speech, free press, and free exercise. The State raised sovereign, official, and qualified immunity defenses in response to Saxion's claims.

Saxion filed a combined traditional and no-evidence motion for summary judgment, arguing that the State's lawsuit violated the federal RFRA and, for the

first time, the Texas RFRA, and her constitutional rights to freedom of religion, free exercise, and free speech.

To her motion, Saxion attached her eleven-page affidavit. In her affidavit, Saxion averred that she promoted dietary supplements to be used in conjunction with faith in God, that she was a regular on TBN's *Praise the Lord* and hosted TBN's *Alternative Health*, and that the attorney general's office intended to silence her ministry and destroy her business. Saxion also stated in her affidavit that

> when ministering on TV or in person, any reference to any ingredient(s) that may be found in a dietary supplement(s) or food(s) was/were always referenced by an ingredient's common or scientific name and never in the mentioning or promotion of a specific brand. For example, if I spoke on vitamin C, I called it vitamin C[,] which is readily available for purchase in multitudes of stores and countless websites.

Saxion incorporated portions of one of her books, which included the following statement:

> Let me assure you, when I talk about feeling great all the time, there are no magic vitamins or minerals or hormones that do the trick . . . No amount of cleansing and detoxifying will remove bitterness, unforgiveness [sic], fear, or any other bad attitude that shouldn't be there. Ask our wonderful heavenly father for wisdom so that you can pluck out the real root and be free and healthy all the time.

Saxion also contended in her affidavit that an assistant attorney general had ridiculed her religious beliefs, that the State had demanded that she lie about her degree in naturopathy based on its allegation that she had improperly represented that she had sponsorship, approval, status, affiliation, or connection

8

by using the title "Doctor," or the abbreviation "Dr.," and that she had never held herself out to be a medical doctor or practitioner and then quoted the disclaimer in her books:

> The information in this book is for educational purposes only and is not recommended as a means of diagnosing, or treating an illness. Neither the publisher nor author is engaged in rendering professional advice or services to the individual reader. All matters regarding physical and mental health should be supervised by a health practitioner knowledgeable in treating that particular condition. Neither the author nor the publisher shall be liable for any loss, injury or damage allegedly arising from any information or suggestion in this book.

Saxion also attached excerpts from her book, *The Gospel of Health: The A to Z Guide to Vibrant Health . . . God's Way*, which included in its "About the Author" section that Saxion was the host of TBN's *On Call*, a weekly television program "dedicated to bringing [the] most up-to-date health and nutritional information" and that she had made numerous other radio and television appearances. And Saxion attached excerpts from her book, *How to Feel Great All the Time*. However, none of the excerpts specifically mention her products at issue in the State's lawsuit.

Saxion also attached the affidavit of George Herbison, her compliance manager, who claimed that Saxion had made efforts to comply with all of the dietary supplement regulations and corrections in response to a Texas Department of State Health Services (TDSHS) inspection and that her efforts made no difference to the State because "[t]hey wanted to silence Valerie's messages on television, radio and in her books," per its proposed injunction.

9

Herbison averred that the State had sued Saxion for refusing to sign the injunction and sent the lawsuit to the *Fort Worth Star-Telegram*, resulting in a news editorial entitled, "State Tells Bogus Doctor to Cut it Out."[3]  Saxion did not attach a copy of the alleged proposed injunction to her motion.

In its response to Saxion's motion, the State argued that Saxion could not satisfy the elements of her claims and had not pleaded a Texas RFRA claim, that she had failed to state a cognizable free speech claim, and that her free exercise claim under the federal and state constitutions and her federal RFRA claim failed as a matter of law.  To its response, the State attached e-mails and other correspondence pertaining to the injunction and the injunction's revised drafts. The first mention of any speech restriction was in an email from Saxion's new counsel in September 2012; the State's documents make clear that the drafted injunction was a "Final Judgment and Agreed Permanent Injunction," to close the existing case, which the State filed in August 2011.  The emails included a December 14, 2011 email that Saxion forwarded to the State regarding TBN's decision to cancel her alternative health programs "due to legal matters that are taking place within your ministry."  They also included an October 2011 email that Herbison sent to the State, in which he said, "I appreciate your [October 14, 2011] email regarding Texas['s] desire to not have business[es] shut down but

---

[3]Saxion attached two August 31, 2011 *Star-Telegram* articles—an editorial and a news article—to her reply to the State's response to her motion, but she did not bring a defamation counterclaim or a counterclaim under civil practice and remedies code chapter 27 for the statements contained in the articles.

rather comply with the law," and his October 12, 2011 email in which he thanked one of the State's attorneys for speaking with him and specifically referenced passing along his thanks to the State's attorney who Saxion, in her affidavit, alleged had ridiculed Saxion's beliefs.[4] They also included Saxion's letters in 2010 regarding proposed settlements prior to the State's filing suit.

The State filed a combined plea to the jurisdiction and motion for summary judgment on Saxion's counterclaims, arguing that Saxion had not pleaded any elements or carried her burden of proof on her counterclaims and affirmative defenses and that her failure to plead a viable constitutional claim was fatal as a matter of law. The State further argued that it had sovereign immunity from Saxion's counterclaims and that Saxion's failure to plead a proper ultra vires claim against an appropriate state official in his official capacity for nondiscretionary acts required dismissal of her claims. And the State argued that the only speech at issue was commercial speech and that no underlying facts supported Saxion's contention that it sought to enjoin religious speech.

Saxion responded to the State's motion by arguing that she was immune from prosecution because her statements rested upon religious doctrine or belief, her speech was not just commercial speech, and the State's TFDCA and DTPA

---

[4]This attorney also filed an affidavit, stating that she had never ridiculed Saxion's beliefs and that Saxion had never brought up her religious beliefs in any of their meetings.

enforcement action violated the federal and Texas RFRAs as a matter of law.[5]

Saxion incorporated by reference the evidence attached to her own motion for summary judgment.

The trial court held a hearing on all of these motions and the plea to the jurisdiction, as well as the State's motion for partial summary judgment on liability, which is not a part of this appeal. The trial court denied all of the motions and the plea. These appeals followed.

### III. Jurisdiction

In two issues, the State argues that Saxion's free exercise claim is barred by sovereign immunity because she failed to allege a valid ultra vires claim against a state official and cannot bring one against the State and that the trial court erred by denying its plea to the jurisdiction on Saxion's federal RFRA claim. Saxion responds that she sufficiently pleaded and supported her allegations with proof of an unconstitutional ultra vires state action and that the trial court did not err by denying the State's plea on her RFRA claim.

---

[5]In her response, Saxion stated,

> It strains credulity to imagine a person would dedicate her life to a theology contained in the book, *The Gospel of Health, the A – Z Guide to Vibrant Health God's Way*, yet market her vitamins independent of any religious motivation. She does attempt to keep health claims off the labels. But maybe some do technically cross a line. She nevertheless cannot be stopped or punished. She avoids health claims on the labels to be respectful, not because she must.

In two issues in her brief as cross-appellant, Saxion argues that the trial court erred by denying her motion for summary judgment. In its brief as cross-appellee, the State contends that we do not have jurisdiction over Saxion's cross-appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(6); *Kaufman v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 142 (Tex. App.—Fort Worth 2009, pet. denied).

## A. "Media Defendant"

We must determine the issue of our jurisdiction over Saxion's appeal before reaching the merits of the remaining issues. *See Royal ISD v. Ragsdale*, 273 S.W.3d 759, 763 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (stating that jurisdiction is fundamental, may not be ignored, and requires dismissal of an appeal over which it is lacking). The standard of review—de novo—is the same with regard to jurisdictional issues and their statutory underpinnings. *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex. 2002) (stating that subject matter jurisdiction is a question of law); *Tarrant Cnty. v. McQuary*, 310 S.W.3d 170, 172 (Tex. App.—Fort Worth 2010, pet. denied) (same); *see also City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008) (setting out statutory construction standard of review).

Under section 51.014(a)(6), a person may appeal from an interlocutory order that

> denies a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose

13

communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73.

Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(6). The supreme court has interpreted subsection (a)(6) as limiting interlocutory appeals to

> "members of the electronic or print media" in certain instances involving the "free speech or free press clause of the First Amendment to the United States Constitution." It can only be read as allowing appeals by members of the media "or a person whose communication appears in or is published by" the media. No other person would typically have standing to appeal a denial of "a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media . . . or a person whose communication appears in or is published by the electronic or print media."

*Tex. A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 843 (Tex. 2007). We strictly construe civil practice and remedies code section 51.014(a) as a narrow exception to the general rule that only final judgments are appealable. *Id.* at 841.

To bring an interlocutory appeal from the denial of her motion for summary judgment, Saxion must meet section 51.014(a)(6)'s status requirement that, with regard to the State's claims against her and her counterclaims and defenses, she is either a member of the electronic or print media *and* acting in that capacity, or a person whose *communication* at issue appears in or is published by the electronic or print media. *See id.* at 843; *Hotze v. Miller*, 361 S.W.3d 707, 711–12 (Tex. App.—Tyler 2012, pet. denied) (applying section 51.014(a)(6) media-defendant status to individual whose allegedly defamatory statements were published as editorials in traditional newspapers, on internet websites, and during

14

radio broadcast because that subsection "applies to anyone whose communication appears in electronic or print media when the claims or defenses involved arise under the free speech clause of the First Amendment"); *Scripps Tex. Newspapers, LP v. Carter*, No. 13-09-00655-CV, 2012 WL 5948955, at *1 n.2 (Tex. App.—Corpus Christi Nov. 21, 2012, pet. denied) (mem. op.) (stating that section 51.014(a)(6), an exception to the general rule that a motion denying summary judgment is not appealable, applies to a media defendant "in a defamation case").

Saxion must also meet section 51.014(a)(6)'s requirement that her claim or defense arises under the Free Speech or Free Press Clause of the First Amendment,[6] or civil practice and remedies code chapter 73 (which pertains to libel actions), or article I, section 8 of the state constitution.[7]

---

[6]The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; *or abridging the freedom of speech, or of the press*; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I (emphasis added).

[7]Article I, section 8 provides:

Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

Saxion attached some evidence to her summary judgment motion showing that she is a published author of at least two books, but she is not being sued by the State in the capacity of an author or with regard to the statements made in her books and other media-related presentations but rather in the capacity of the owner of a business that manufactures and sells products that the State regulates. *Cf. Serv. Emps. Int'l Union Local 5 v. Prof'l Janitorial Serv. of Houston, Inc.*, 415 S.W.3d 387, 395 (Tex. App.—Houston [1st Dist.] 2013, pet. filed) (stating, in defamation suit, that "[t]he right of interlocutory appeal under section 51.014(a)(6) depends on who speaks, not on how they speak").

Further, the "communication" in the State's lawsuit pertains to labeling, not libel,[8] Saxion has not shown that her products' allegedly improper and misleading labels appeared in or were published by the electronic or print media, and her own evidence shows that she kept her supplements business separate from her media activities. *Cf. Kaufman*, 291 S.W.3d 137–43 (concluding, in defamation suit, that author of an Internet article was a section 51.014(a)(6) media defendant

Tex. Const. art. I, § 8.

[8]Subsection (a)(6) was added to the interlocutory appeal statute in 1993 in response to lobbying efforts by members of the print media in response to "some highly publicized plaintiffs' libel verdicts in cases that had been believed to be of doubtful merit." Thomas J. Williams, *Media Law: Interlocutory Appeal*, 67 Tex. B.J. 760, 760 (2004) (characterizing the addition of subsection (a)(6) as "[o]ne of the most significant developments affecting media law in Texas" because it allows "a media libel defendant to take an immediate, interlocutory appeal from the denial of a motion for summary judgment"); *see also* Act of May 25, 1993, 73rd Leg., R.S., ch. 855, § 1, 1993 Tex. Gen. Laws 3365, 3365–66.

based on his journalistic background and notoriety outside the parameters of the internet article at issue and his publisher's broad readership and existence as a "news/commentary medium" independent from his articles); *New Times, Inc. v. Doe*, 183 S.W.3d 122, 123–24 (Tex. App.—Dallas 2006, no pet.) (allowing interlocutory appeal in wrongful-disclosure-of-test-results suit in which defendants published plaintiff's HIV-positive status in a newspaper article).

None of Saxion's First-Amendment-based defenses or counterclaims are made with regard to libel, slander, or other defamation-based claims, to wrongful disclosure, or to invasion of privacy. *Cf. Hotze*, 361 S.W.3d at 711–12 (holding, in libel and slander suit, that statements made by political writer and journalist were those of a section 51.014(a)(6) media defendant); *Main v. Royall*, 348 S.W.3d 381, 384–85, 387 (Tex. App.—Dallas 2011, no pet.) (holding, in libel suit brought against author and book publisher for statements about appellant in their book, that appellees were "member[s] of the electronic or print media"); *Brock v. Tandy*, No. 02-08-00400-CV, 2009 WL 1905130, at *1, 4 (Tex. App.—Fort Worth July 2, 2009, pet. denied) (mem. op. on reh'g) (holding, on interlocutory appeal under section 51.014(a)(6), that appellant's paid advertisement in local newspaper was capable of being defamatory); *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 725 (Tex. App.—Austin 2001, pet. denied) (op. on reh'g) (holding that plaintiff's artful pleading against media-defendant newspaper that published his dead wife's photo failed to state any viable cause of action). *Compare* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(6) (applying generally to

17

media defendants facing defamation complaints), *with id.* § 27.001(1) (West Supp. 2014) (defining "communication" for purposes of the Texas Citizen Participation Act as "includ[ing] the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic"). And section 51.014(a)(6)'s plain language does not include the Free Exercise Clause, the Freedom of Religion Clause, or the Texas or federal RFRAs as the basis for either a claim or a defense. *Cf. Holly Corp. v. Longhorn Partners Pipeline, L.P.*, No. 08-02-00186-CV, 2002 WL 1929493, at *1 (Tex. App.—El Paso Aug. 21, 2002, pet. dism'd) (not designated for publication) (dismissing interlocutory appeal when appellants were not members of the electronic or print media and the only First-Amendment-related defenses asserted by them with regard to their lobbying activities were the rights of association and to petition). We conclude that we lack jurisdiction over Saxion's interlocutory cross-appeal under section 51.014(a)(6), and we dismiss her cross-appeal.

## B. Plea to the Jurisdiction

With regard to our review of a plea to the jurisdiction, if the plea challenges the pleadings, we construe the pleadings liberally in favor of the nonmovant and look to the pleader's intent. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009). If the plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issue and take all evidence favorable to the nonmovant as true, indulging every reasonable inference and resolving any

18

doubts in the nonmovant's favor.  *Id.*  If the jurisdictional evidence creates a fact question, then the trial court cannot grant the plea to the jurisdiction, and the issue must be resolved by the fact finder.  *Id.*

### 1. Ultra Vires

In its first issue, the State contends that Saxion's Free Exercise claim is barred because she has failed to allege a valid ultra vires claim against a state official and cannot pursue such action directly against the State.  *See id.* at 368–69, 372–73 (setting out ultra vires exception for official-capacity suits against government actors but reiterating that "as a technical matter, the governmental entities themselves—as opposed to their officers in their official capacity—remain immune from suit"); *see also Lowell v. City of Baytown*, 356 S.W.3d 499, 502 (Tex. 2011) (restating that claims for prospective declaratory and injunctive relief must be brought against the relevant government officials rather than the governmental entity itself).

> The supreme court has stated that
>
> suits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity . . . .  To fall within this *ultra vires* exception, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act. . . .  Stated another way, these suits do not seek to alter government policy but rather to enforce existing policy.

*Heinrich*, 284 S.W.3d at 372 (footnote omitted) (citations omitted).  "Conversely, if the plaintiff alleges only facts demonstrating acts within the officer's legal

19

authority and discretion, the claim seeks to control state action, and is barred by sovereign immunity." *Creedmoor-Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality*, 307 S.W.3d 505, 515–16 (Tex. App.—Austin 2010, no pet.). Likewise, if the claimant attempts to restrain a state officer's conduct on the grounds that it is unconstitutional, the claimant must allege facts that actually constitute a constitutional violation. *Id.* at 516; *see also Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) (stating that claims may be brought under the ultra vires exception "against a state official for nondiscretionary acts unauthorized by law"); *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 11 (Tex. 2011) (requiring claimant to plead a "viable" constitutional claim); *Price v. Tex. Alcoholic Beverage Comm'n*, No. 01-12-01164-CV, 2014 WL 3408696, at *3 (Tex. App.—Houston [1st Dist.] July 10, 2014, pet. denied) (mem. op.) ("To state a claim within the waiver of sovereign immunity, the plaintiff must plead a facially valid constitutional claim.").

Saxion challenged the attorney general's discretion or authority to enforce the TFDCA and DTPA against her as infringing on her right to free exercise of religion under the state and federal constitutions.[9]

If government action burdens the free exercise of religion by interfering with an individual's observance or practice of a central religious belief, *see*

---

[9]When, as here, neither party argues that the state constitution offers greater protection, we treat the state and federal free exercise guarantees as coextensive. *HEB Ministries, Inc. v. Tex. Higher Educ. Coordinating Bd.*, 235 S.W.3d 627, 649–50 (Tex. 2007).

*Westbrook v. Penley*, 231 S.W.3d 389, 395 (Tex. 2007), the issue is whether the burden is a substantial one, and if so, whether it is justified by a compelling governmental interest. *Jimmy Swaggart Ministries v. Bd. of Equalization of Calif.*, 493 U.S. 378, 384–85, 110 S. Ct. 688, 693 (1990) (citing *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699, 109 S. Ct. 2136, 2148 (1989)).

The twenty-four "practices in pursuit and conduct of trade or commerce" listed by the State in its live pleading do not seek to restrain Saxion from practicing any religious beliefs or expressing any religious opinions. *Cf. Tilton v. Marshall*, 925 S.W.2d 672, 677 (Tex. 1996) (orig. proceeding) (op. on reh'g) (noting that Texas Constitution article I, section 6's interpretive commentary reflects that conduct "even under religious guise remains subject to regulation for the protection of society").[10]   Rather, the relief sought by the State attempts to

---

[10]Although Saxion relies on *Tilton* to support her arguments, it is inapposite on the facts and record before us.  In *Tilton*, the relator—a televangelist—in addition to relators Word of Faith World Outreach Center Church, Inc. and Word of Faith World Outreach Center Church, was sued for fraud, conspiracy, and intentional infliction of emotional distress by the real parties in interest, who had sent money and prayer requests to the relator as a result of his television programs.  925 S.W.2d at 675.  The relator filed a petition for writ of mandamus, arguing that the trial court had no jurisdiction because the state and federal constitutions and the federal RFRA barred the real parties' causes of action against him.  *Id.* at 676.

The court granted mandamus relief as to the real parties' intentional-infliction-of-emotional-distress and related conspiracy claims but denied relief with regard to the fraud claims that did not involve allegedly fraudulent and deceitful presentations of religious doctrine or belief.  *Id.* at 678–79, 682 (concluding that the truth or falsity of a religious representation is beyond the scope of judicial inquiry).  The plurality cautioned that the trial court had to carefully consider each alleged misrepresentation and determine which fraud

regulate the advertising and sale of certain dietary supplements as a proper restraint on commercial speech necessary to protect the public. *See AEP Tex. Comm. & Indus. Retail Ltd. P'ship v. Pub. Util. Comm'n of Tex.*, 436 S.W.3d 890, 924 (Tex. App.—Austin 2014, no pet.) ("[T]here is no value to consumers or society for misleading or deceptive commercial speech."). Although Saxion contends in her affidavit that the State's employees threatened her and mocked her beliefs—evidence that the State contested—she failed to show how her religious calling to educate others on the health benefits of vitamins was substantially burdened when the part of her evidence that was undisputed by the State showed that she was able to separate her general message about vitamins and minerals from any promotion of a specific brand from her dietary-supplement business. Therefore, because Saxion has failed to allege a viable ultra vires claim with regard to her free-exercise-of-religion rights and the attorney general's discretion and authority to enforce the TFDCA and DTPA, we sustain the State's first issue.

---

claims, if any, involved religious doctrines or beliefs, to ensure that the trier of fact did not hear evidence on them or pass on their veracity. *Id.* at 680. None of the labeling or other product-related issues listed by the State in its live pleading involve any statements of religious belief.

22

### 2. Federal RFRA Claim

In its second issue, the State argues that the trial court erred by denying its plea to the jurisdiction as to Saxion's federal RFRA claim. As pointed out by the State, the federal RFRA is inapplicable to governmental action by a state instead of the federal government. *See City of Boerne v. Flores*, 521 U.S. 507, 527, 532, 536, 117 S. Ct. 2157, 2167, 2170, 2172 (1997) (holding that the federal RFRA could not be considered remedial, preventive legislation and that Congress did not have a substantive, non-remedial power under the Fourteenth Amendment to enforce the federal RFRA against the states); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2759 (2014) (stating that the federal RFRA "prohibits the Federal Government from taking any action that substantially burdens the exercise of religion unless that action constitutes the least restrictive means of serving a compelling government interest"); *Barr v. City of Sinton*, 295 S.W.3d 287, 295 (Tex. 2009) (noting that as originally enacted, the RFRA applied to the states as well as the federal government but that after the Supreme Court held that Congress had exceeded its authority in extending the RFRA to the states in *City of Boerne*, Congress amended the RFRA to limit its application to the federal government, federal territories and possessions, the District of Columbia, and Puerto Rico). Therefore, we sustain the State's second issue.

## IV. Conclusion

We dismiss Saxion's cross-appeal for want of jurisdiction. *See* Tex. R. App. P. 43.2(f). Having sustained both of the State's issues, we reverse the trial

court's denial of the State's plea to the jurisdiction as it pertains to these two issues, render judgment dismissing Saxion's free exercise and federal RFRA claims,[11] and remand the case to the trial court for further proceedings.

/s/ Bob McCoy

BOB MCCOY
JUSTICE

PANEL:  DAUPHINOT, WALKER and MCCOY, JJ.

DELIVERED:  December 4, 2014

---

[11]Although Saxion contends that she sufficiently alleged a claim under the Texas RFRA by mentioning the federal RFRA and the state constitution, even if this were sufficient to plead a Texas RFRA claim, the record does not reflect that she also complied with the Texas RFRA's pre-suit notice requirement.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 110.006(a) (West 2011); *see also Morgan v. Plano ISD*, 724 F.3d 579, 586 (5th Cir. 2013) (concluding that the Texas RFRA's pre-suit notice requirement is jurisdictional).